NO. 13-2370

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ROMAN ZAK, Plaintiff/Appellant,

vs.

CHELSEA THERAPEUTICS INTERNATIONAL, LTD., SIMON PEDDER
AND WILLIAM D. SCHWIETERMAN, Defendants/Appellees

**On Appeal from the United States District Court for the Western District of
North Carolina, Charlotte Division, 3:12-cv-00213-MOC-DCK
The Honorable Max O. Cogburn, Jr.**

### RESPONSE BRIEF OF APPELLEES

Lee M. Whitman (NC Bar No. 20193)
Tobias S. Hampson (NC Bar No. 28557)
WYRICK ROBBINS YATES &
    PONTON LLP
4101 Lake Boone Trail, Suite 300
Raleigh, NC 27607
Telephone: (919) 781-4000
Facsimile: (919) 781-4865
Email:  lwhitman@wyrick.com
        thampson@wyrick.com

Barry M. Kaplan
Gregory L. Watts
WILSON SONSINI GOODRICH &
    ROSATI
Professional Corporation
701 Fifth Avenue, Suite 5100
Seattle, WA 98104
Telephone: (206) 883-2500
Facsimile: (206) 883-2699
Email:  bkaplan@wsgr.com
        gwatts@wsgr.com

Ignacio E. Salceda
Cheryl W. Foung
WILSON SONSINI GOODRICH &
    ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 493-6811
Email:  isalceda@wsgr.com

*Attorneys for Defendants/Appellees Chelsea Therapeutics, International, Ltd.,
Simon Pedder and William D. Schwieterman*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-2370__    Caption: __Cameron McIntyre v. Chelsea Therapeutics International, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Chelsea Therapeutics International, Ltd.__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  [✓] YES [ ] NO


2.    Does party/amicus have any parent corporations?                            [ ] YES [✓] NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:



3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                    [ ] YES [✓] NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Lee M. Whitman _____     Date: _____11/22/2013_____

Counsel for: Defendants _____

## CERTIFICATE OF SERVICE
****************************

I certify that on _____11/22/2013_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Please see attached list

/s/ Lee M. Whitman _____          _____11/22/2013_____
(signature)                                              (date)

- 2 -

**Cameron McIntyre, et al. v. Chelsea Therapeutics International, LTD (No. 13-2370)**

## LIST OF COUNSEL SERVED

| | |
|---|---|
| Richard W. Gonnello<br>Francis P. McConville<br>Faruqi & Faruqi, LLP<br>369 Lexington Ave., 10th Floor<br>New York, NY 10017<br>rgonnello@faruqilaw.com<br>fmcconville@faruqilaw.com<br>*PLAINTIFFS' COUNSEL* | Paul A. Daniels<br>Ward Black Law<br>208 W. Wendover Ave.<br>Greensboro, NC 27401<br>pdaniels@wardblacklaw.com<br>*PLAINTIFFS' COUNSEL* |
| Gary Walker Jackson<br>Jackson & McGee, LLP<br>225 E. Worthington Street<br>Charlotte, NC 28203<br>gjackson@ncadvocates.com<br>*PLAINTIFFS' COUNSEL* | Jeremy Allen Lieberman<br>Pomerantz, Haudek, et. al.<br>600 Third Ave.<br>New York, NY 10016<br>jalieberman@pomlaw.com<br>*PLAINTIFFS' COUNSEL* |
| Barry M. Kaplan<br>Gregory L. Watts<br>Wilson Sonsini Goodrich & Rosati<br>701 Fifth Avenue, Suite 5100<br>Seattle, WA 98104<br>bkaplan@wsgr.com<br>gwatts@wsgr.com<br>*DEFENDANTS' COUNSEL* | Ignacio E. Salceda<br>Wilson Sonsini Goodrich & Rosati<br>650 Page Mill Road<br>Palo Alto, CA 94304-1050<br>isalceda@wsgr.com<br>*DEFENDANTS' COUNSEL* |

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. _13-2370_    Caption: _Cameron McIntyre v. Chelsea Therapeutics International, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Simon Pedder_
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Lee M. Whitman                          Date:    11/22/2013

Counsel for: Defendants

## CERTIFICATE OF SERVICE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I certify that on _____11/22/2013_____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Please see attached list

/s/ Lee M. Whitman                                    11/22/2013
_____(signature)_____                             _____(date)_____

**Cameron McIntyre, et al. v. Chelsea Therapeutics International, LTD (No. 13-2370)**

**LIST OF COUNSEL SERVED**

| | |
|---|---|
| Richard W. Gonnello<br>Francis P. McConville<br>Faruqi & Faruqi, LLP<br>369 Lexington Ave., 10th Floor<br>New York, NY 10017<br>rgonnello@faruqilaw.com<br>fmcconville@faruqilaw.com<br>*PLAINTIFFS' COUNSEL* | Paul A. Daniels<br>Ward Black Law<br>208 W. Wendover Ave.<br>Greensboro, NC 27401<br>pdaniels@wardblacklaw.com<br>*PLAINTIFFS' COUNSEL* |
| Gary Walker Jackson<br>Jackson & McGee, LLP<br>225 E. Worthington Street<br>Charlotte, NC 28203<br>gjackson@ncadvocates.com<br>*PLAINTIFFS' COUNSEL* | Jeremy Allen Lieberman<br>Pomerantz, Haudek, et. al.<br>600 Third Ave.<br>New York, NY 10016<br>jalieberman@pomlaw.com<br>*PLAINTIFFS' COUNSEL* |
| Barry M. Kaplan<br>Gregory L. Watts<br>Wilson Sonsini Goodrich & Rosati<br>701 Fifth Avenue, Suite 5100<br>Seattle, WA 98104<br>bkaplan@wsgr.com<br>gwatts@wsgr.com<br>*DEFENDANTS' COUNSEL* | Ignacio E. Salceda<br>Wilson Sonsini Goodrich & Rosati<br>650 Page Mill Road<br>Palo Alto, CA 94304-1050<br>isalceda@wsgr.com<br>*DEFENDANTS' COUNSEL* |

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. _13-2370_        Caption: _Cameron McIntyre v. Chelsea Therapeutics International, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_William D. Schwieterman_
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Lee M. Whitman _____          Date: _____11/22/2013_____

Counsel for: Defendants _____

## CERTIFICATE OF SERVICE
*************************

I certify that on _____11/22/2013_____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Please see attached list

/s/ Lee M. Whitman _____          _____11/22/2013_____
        (signature)                                    (date)

**Cameron McIntyre, et al. v. Chelsea Therapeutics International, LTD (No. 13-2370)**

**LIST OF COUNSEL SERVED**

| | |
|---|---|
| Richard W. Gonnello<br>Francis P. McConville<br>Faruqi & Faruqi, LLP<br>369 Lexington Ave., 10th Floor<br>New York, NY 10017<br>rgonnello@faruqilaw.com<br>fmcconville@faruqilaw.com<br>*PLAINTIFFS' COUNSEL* | Paul A. Daniels<br>Ward Black Law<br>208 W. Wendover Ave.<br>Greensboro, NC 27401<br>pdaniels@wardblacklaw.com<br>*PLAINTIFFS' COUNSEL* |
| Gary Walker Jackson<br>Jackson & McGee, LLP<br>225 E. Worthington Street<br>Charlotte, NC 28203<br>gjackson@ncadvocates.com<br>*PLAINTIFFS' COUNSEL* | Jeremy Allen Lieberman<br>Pomerantz, Haudek, et. al.<br>600 Third Ave.<br>New York, NY 10016<br>jalieberman@pomlaw.com<br>*PLAINTIFFS' COUNSEL* |
| Barry M. Kaplan<br>Gregory L. Watts<br>Wilson Sonsini Goodrich & Rosati<br>701 Fifth Avenue, Suite 5100<br>Seattle, WA 98104<br>bkaplan@wsgr.com<br>gwatts@wsgr.com<br>*DEFENDANTS' COUNSEL* | Ignacio E. Salceda<br>Wilson Sonsini Goodrich & Rosati<br>650 Page Mill Road<br>Palo Alto, CA 94304-1050<br>isalceda@wsgr.com<br>*DEFENDANTS' COUNSEL* |

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-2370__    Caption: __Cameron McIntyre v. Chelsea Therapeutics International, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__J. Nick Riehle__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?  ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
      If yes, identify all such owners:

10/28/2013 SCC                          - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Lee M. Whitman _____    Date: _____11/22/2013_____

Counsel for: Defendants _____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____11/22/2013_____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Please see attached list

/s/ Lee M. Whitman _____    _____11/22/2013_____
(signature)    (date)

- 2 -

**Cameron McIntyre, et al. v. Chelsea Therapeutics International, LTD (No. 13-2370)**

### LIST OF COUNSEL SERVED

| | |
|---|---|
| Richard W. Gonnello<br>Francis P. McConville<br>Faruqi & Faruqi, LLP<br>369 Lexington Ave., 10th Floor<br>New York, NY 10017<br>rgonnello@faruqilaw.com<br>fmcconville@faruqilaw.com<br>*PLAINTIFFS' COUNSEL* | Paul A. Daniels<br>Ward Black Law<br>208 W. Wendover Ave.<br>Greensboro, NC 27401<br>pdaniels@wardblacklaw.com<br>*PLAINTIFFS' COUNSEL* |
| Gary Walker Jackson<br>Jackson & McGee, LLP<br>225 E. Worthington Street<br>Charlotte, NC 28203<br>gjackson@ncadvocates.com<br>*PLAINTIFFS' COUNSEL* | Jeremy Allen Lieberman<br>Pomerantz, Haudek, et. al.<br>600 Third Ave.<br>New York, NY 10016<br>jalieberman@pomlaw.com<br>*PLAINTIFFS' COUNSEL* |
| Barry M. Kaplan<br>Gregory L. Watts<br>Wilson Sonsini Goodrich & Rosati<br>701 Fifth Avenue, Suite 5100<br>Seattle, WA 98104<br>bkaplan@wsgr.com<br>gwatts@wsgr.com<br>*DEFENDANTS' COUNSEL* | Ignacio E. Salceda<br>Wilson Sonsini Goodrich & Rosati<br>650 Page Mill Road<br>Palo Alto, CA 94304-1050<br>isalceda@wsgr.com<br>*DEFENDANTS' COUNSEL* |

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-2370__    Caption: __Cameron McIntyre v. Chelsea Therapeutics International, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__L. Arthur Hewitt__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

10/28/2013 SCC                        - 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Lee M. Whitman _____   Date: _____11/22/2013_____

Counsel for: Defendants _____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____11/22/2013_____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Please see attached list

/s/ Lee M. Whitman _____          _____11/22/2013_____
           (signature)                                    (date)

- 2 -

**Cameron McIntyre, et al. v. Chelsea Therapeutics International, LTD (No. 13-2370)**

### LIST OF COUNSEL SERVED

| | |
|---|---|
| Richard W. Gonnello<br>Francis P. McConville<br>Faruqi & Faruqi, LLP<br>369 Lexington Ave., 10th Floor<br>New York, NY 10017<br>rgonnello@faruqilaw.com<br>fmcconville@faruqilaw.com<br>*PLAINTIFFS' COUNSEL* | Paul A. Daniels<br>Ward Black Law<br>208 W. Wendover Ave.<br>Greensboro, NC 27401<br>pdaniels@wardblacklaw.com<br>*PLAINTIFFS' COUNSEL* |
| Gary Walker Jackson<br>Jackson & McGee, LLP<br>225 E. Worthington Street<br>Charlotte, NC 28203<br>gjackson@ncadvocates.com<br>*PLAINTIFFS' COUNSEL* | Jeremy Allen Lieberman<br>Pomerantz, Haudek, et. al.<br>600 Third Ave.<br>New York, NY 10016<br>jalieberman@pomlaw.com<br>*PLAINTIFFS' COUNSEL* |
| Barry M. Kaplan<br>Gregory L. Watts<br>Wilson Sonsini Goodrich & Rosati<br>701 Fifth Avenue, Suite 5100<br>Seattle, WA 98104<br>bkaplan@wsgr.com<br>gwatts@wsgr.com<br>*DEFENDANTS' COUNSEL* | Ignacio E. Salceda<br>Wilson Sonsini Goodrich & Rosati<br>650 Page Mill Road<br>Palo Alto, CA 94304-1050<br>isalceda@wsgr.com<br>*DEFENDANTS' COUNSEL* |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................. 1

JURISDICTIONAL STATEMENT ........................................... 4

ISSUES PRESENTED ........................................................... 4

STATEMENT OF THE CASE ................................................. 5

    A.    Nature Of The Case ................................................. 5

    B.    Course and Disposition Of Proceedings ..................... 5

    C.    Factual Background ................................................. 5

        1.    The Defendants, Neurogenic Orthostatic Hypotension, And Northera ................................................. 5

        2.    The FDA's Drug Approval Process ........................... 7

        3.    Chelsea's Lengthy Interaction With The FDA ............ 8

            The Studies And The FDA's Grant Of A Special Protocol Assessment ................................................. 8

        4.    Evaluation Of Chelsea's NDA ................................ 10

        5.    The FDA's Complete Response Letter ..................... 12

        6.    The District Court's Decision On Defendants' Motion To Dismiss ................................................. 13

STANDARD OF REVIEW ................................................... 14

SUMMARY OF ARGUMENT ............................................... 14

        No Inference Of Scienter ....................................... 14

        No Error Based On Judicial Notice ......................... 16

-i-

No Actionable Statement Based On Briefing
Document ................................................................16

No Challenge To Dismissal With Prejudice ......................17

ARGUMENT ......................................................................... 18

I.    THE STANDARDS APPLICABLE TO THIS REFORM ACT CASE ...... 18

II.   PLAINTIFF FAILED TO RAISE A STRONG INFERENCE OF
      SCIENTER ................................................................. 20

      A.    Plaintiff Did Not Adequately Support Its Fundamental Premise
            That The FDA Told Defendants Two Trials Would Be
            Required ...................................................... 20

      B.    Plaintiff Relied On A Theory Of Fraud That The Fourth Circuit
            Squarely Rejected ............................................ 26

      C.    The Appeal Abandons Reliance On Confidential Witnesses ............ 28

      D.    The Competing Nonculpable Inferences Defeated Scienter .............. 33

            Both The Absence Of Stock Sales And The Stock
            Purchases Negated Scienter ...................................33

            Chelsea's Investment In Northera Was Inconsistent
            With Scienter ...................................................35

            Chelsea's Blunt Warnings Undermined Scienter ...............38

      E.    The District Court Did Not Err By Considering SEC Filings. .......... 42

III.  AFFIRMANCE IS WARRANTED ON THE ALTERNATIVE
      GROUND THAT THE COMPLAINT FAILED TO PLEAD A
      FALSE OR MISLEADING STATEMENT ................................. 47

            No False Or Misleading Statement About The
            Briefing Document .............................................49

            The Appeal Abandons Allegedly False Statements
            About The Validation Of The OHQ ...................................52

Defendants Made No False Or Misleading Statements About The Studies ................................................................54

IV.    THE CONTROL PERSON CLAIM NECESSARILY FAILED ................ 55

V.     THE APPEAL DOES NOT CHALLENGE DISMISSAL WITH PREJUDICE .......................................................................... 55

CONCLUSION ............................................................................. 57

REQUEST FOR ORAL ARGUMENT ................................................ 57

CERTIFICATION OF COMPLIANCE TO FED. R. APP. P 32(a)(7)(C) ............ 58

# TABLE OF AUTHORITIES

**Page**

## CASES

*Acito v. Imcera Grp., Inc.*,
    47 F.3d 47 (2d Cir. 1995) ................................................................44

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).........................................................................36

*Avon Pension Fund v. GlaxoSmithKline PLC*,
    343 F. App'x 671 (2d Cir. 2009).....................................................35

*Backman v. Polaroid Corp.*,
    910 F.2d 10 (1st Cir. 1990).............................................................50

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) ..........................................................51

*Bryant v. Avado Brands, Inc.*,
    187 F.3d 1271 (11th Cir. 1999) ......................................................44

*Cho v. UCBH Holdings, Inc.*,
    No. C 09-4208 JSW, 2011 WL 3809903 (N.D. Cal. May 17, 2011)...........35

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters
    Corp.*, 632 F.3d 751 (1st Cir. 2011) ........................................41, 46

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters
    Corp.*, 699 F. Supp. 2d (D. Mass. 2010) ......................................46

*Cozzarelli v. Inspire Pharm. Inc.*,
    549 F.3d 618 (4th Cir. 2008) ...................................................*passim*

*DeMarco v. DepoTech Corp.*,
    149 F. Supp. 2d 1212 (S.D. Cal. 2001) ....................................30, 31

*Ezra Charitable Trust v. Tyco Int'l, Ltd.*,
    466 F.3d 1 (1st Cir. 2006).................................................................41

*Greenhouse v. MCG Capital Corp.*,
    392 F.3d 650 (4th Cir. 2004) ................................................47, 48, 50

*Higginbotham v. Baxter Int'l Inc.*,
495 F.3d 753 (7th Cir. 2007) ........................................................25

*In re Amylin Pharm., Inc. Sec. Litig.*,
No. 01 cv 1455 BTM(NLS), 2003 U.S. Dist. LEXIS 7667
(S.D. Cal. May 1, 2003)..................................................................25

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) .......................................................36

*In re AstraZeneca Sec. Litig.*,
559 F. Supp. 2d 453 (S.D.N.Y. 2008), *aff'd sub nom.*
*State Univs. Ret. Sys. v. Astrazeneca PLC*, 334 F. App'x 404
(2d Cir. 2009)...........................................................................31, 42

*In re Cerner Corp. Sec. Litig.*,
425 F.3d 1079 (8th Cir. 2005) .......................................................44

*In re Conventry Healthcare, Inc. Sec. Litig.*,
No. 08:09-CV-2337-AW, 2011 WL 1230998 (D. Md. Mar. 30, 2011)........32

*In re Cree, Inc. Sec. Litig.*,
333 F. Supp. 2d 461 (M.D.N.C. 2004) ...........................................38

*In re Criimi Mae, Inc. Sec. Litig.*,
94 F. Supp. 2d 652 (D. Md. 2000)..................................................37

*In re CV Therapeutics, Inc.*,
No. C 03-03709 SI, 2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) ..............25

*In re Cyberonics Inc. Sec. Litig.*,
No. H-05-2121, 2006 U.S. Dist. LEXIS 50500
(S.D. Tex. July 20, 2006).................................................................31

*In re E.Spire Commc'ns, Inc., Sec. Litig.*,
127 F. Supp. 2d 734 (D. Md. 2001).................................................34

*In re First Union Corp. Sec. Litig.*,
128 F. Supp. 2d 871 (W.D.N.C. 2001).......................................34, 54

*In re Huntington Bancshares Inc. Sec. Litig.*,
674 F. Supp. 2d 951 (S.D. Ohio 2009)...........................................47

*In re Inspire Pharm., Inc. Sec. Litig.*,
    515 F. Supp. 2d 631 (M.D.N.C. 2007), *aff'd*, 549 F.3d 618
    (4th Cir. 2008) ...................................................................27, 45

*In re K-Tel Int'l, Inc., Sec. Litig.*,
    107 F. Supp. 2d 994 (D. Minn. 2000), *aff'd*, 300 F.3d 881
    (8th Cir. 2002) ...................................................................47

*In re MannKind Sec. Actions*,
    835 F. Supp. 2d 797 (C.D. Cal. 2012)......................................26

*In re Medimmune, Inc., Sec. Litig.*,
    873 F. Supp. 953 (D. Md. 1995)..............................................30

*In re PEC Solutions, Inc. Sec. Litig.*,
    418 F.3d 379 (4th Cir. 2005) ...............................................*passim*

*In re PEC Solutions, Inc. Sec. Litig.*,
    No. 03-CV-331, 2004 WL 1854202 (E.D. Va. May 25, 2004).........35, 37, 51

*In re Rigel Pharm., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ...............................................54

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ...............................................44

*In re Sportsline.com Sec. Litig.*,
    366 F. Supp. 2d 1159 (S.D. Fla. 2004).....................................47

*In re Trex Co., Inc. Sec. Litig.*,
    454 F. Supp. 2d 560 (W.D. Va. 2006).......................................30

*In re Vertex Pharm., Inc., Sec. Litig.*,
    357 F. Supp. 2d 343 (D. Mass. 2005).......................................30

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ...............................................36

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*,
    537 F.3d 527 (5th Cir. 2008) ..............................................43, 47

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ..............................................34

*Longman v. Food Lion, Inc.*,
 197 F.3d 675 (4th Cir. 1999) ........................................................19

*Malin v. XL Capital, Ltd.*,
 312 F. App'x 400 (2d Cir. 2009) ..............................................41, 47

*Malin v. XL Capital Ltd.*,
 499 F. Supp. 2d 117 (D. Conn. 2007) .........................................47

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
 576 F.3d 172 (4th Cir. 2009) ...................................................41, 55

*Matrixx Initiatives, Inc. v. Siracusano*,
 131 S. Ct. 1309 (2011).................................................................51

*Merck KGaA v. Integra Lifesciences I, Ltd.*,
 545 U.S. 193 (2005)......................................................................42

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
 547 U.S. 71 (2006).......................................................................18

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
 540 F.3d 1049 (9th Cir. 2008) ..............................34, 44, 46, 52

*Mizzaro v. Home Depot, Inc.*,
 544 F.3d 1230 (11th Cir. 2008) .................................................44

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
 537 F.3d 35 (1st Cir. 2008)........................................................29

*Oppenheim Pramerica Asset Mgmt. S.a.r.l. v. Encysive Pharm., Inc.*,
 No. H-06-3022, 2007 U.S. Dist. LEXIS 69121
 (S.D. Tex. Sept. 18, 2007) ........................................................31

*Oran v. Stafford*,
 226 F.3d 275 (3d Cir. 2000) .....................................................47

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
 353 F.3d 338 (4th Cir. 2003) .......................................14, 18, 27

*Padnes v. Scios Nova Inc.*,
 No. C 95-1693 MHP, 1996 WL 539711 (N.D. Cal. Sept. 18, 1996)......54, 55

*Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*,
    No. 5:11-cv-4-D, 2013 WL 1192004 (E.D.N.C. Mar. 22, 2013)..................32

*Phillips v. LCI Int'l, Inc.*,
    190 F.3d 609 (4th Cir. 1999) ........................................................25

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ........................................................44

*Raab v. Gen. Physics Corp.*,
    4 F.3d 286 (4th Cir. 1993) ..........................................................24

*Sarafin v. BioMimetic Therapeutics, Inc.*,
    No. 3:11-0653, 2013 WL 139521 (M.D. Tenn. Jan. 10, 2013).............*passim*

*Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*,
    673 F.3d 333 (4th Cir. 2012) ........................................................48

*Suter v. United States*,
    441 F.3d 306 (4th Cir. 2006) ........................................................48

*Teachers' Ret. Sys. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ......................................14, 18, 33, 55

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..........................................................18, 19, 43

*Ward v. Succession of Freeman*,
    854 F.2d 780 (5th Cir. 1988) ........................................................24

*Wielgos v. Commonwealth Edison Co.*,
    892 F.2d 509 (7th Cir. 1989) ........................................................25

*Ziemba v. Cascade Int'l, Inc.*,
    256 F.3d 1194 (11th Cir. 2001) ....................................................41

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ..................................................30, 32

## STATUTES, RULES AND REGULATIONS

15 U.S.C. § 78j(b) ........................................................................5

15 U.S.C. § 78t(a) ........................................................................5

15 U.S.C. § 78u-4(a). ...................................................................2

15 U.S.C. § 78u-4(b)(1) .............................................................20

15 U.S.C. § 78u-4(b)(2) .........................................................13, 19

15 U.S.C. § 78u-4(b)(3)(A) ........................................................20

21 U.S.C. § 355(a) .......................................................................7

21 U.S.C. § 355(d) .....................................................................23

21 U.S.C. § 360bb ........................................................................8

17 C.F.R. § 240.10b-5 ..................................................................5

17 C.F.R. § 240.10b-5(b) ...........................................................51

21 C.F.R. § 14.160 .......................................................................7

21 C.F.R. § 14.171 .......................................................................7

21 C.F.R. § 312. ..........................................................................7

21 C.F.R. § 312.21 .......................................................................7

21 C.F.R. § 314.100 .....................................................................7

21 C.F.R. § 314.101 .....................................................................7

## MISCELLANEOUS

Nicholas S. Downing, *et al.*, Clinical Trial Evidence Supporting FDA
    Approval of Novel Therapeutic Agents, 2005-2012, 311(4)
    (Journal of Am. Med. Ass'n 2014)................................................24

Horatio Kaufmann, *et al.*, The Orthostatic Hypotension Questionnaire
    (OHQ): Validation of a Novel Symptom Assessment Scale,
    Clin. Auton. Res 22:79-90 (2012) ...............................................53

Christopher-Paul Milne, *The Single Controlled Trial: Industry Survey
    Indicates that Implementation is Still a Work in Progress*, 36
    Drug Information J. 291 (2002).....................................................23

Defendants/Appellees Chelsea Therapeutics International, Ltd. ("Chelsea"), Simon Pedder and William D. Schwieterman (collectively "Defendants") respectfully submit this Response Brief.

## INTRODUCTION

One would never know from Appellant's Opening Brief ("AOB") that just a few years ago, this Court in a remarkably similar case rejected as not cognizable the same theories of fraud Plaintiff advances here. *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618 (4th Cir. 2008). The facts at bar present an even more compelling basis for dismissal than in *Cozzarelli*. The District Court made no errors, and affirmance in all respects is mandated.

Chelsea is a small development stage pharmaceutical company that spent five years testing Northera™, a drug to treat a disease that experts describe as "devastating" and "unbearable." Northera is intended to treat symptomatic neurogenic orthostatic hypotension, a severe prolonged drop in blood pressure experienced when a patient stands, which leads to dizziness and other symptoms in patients with Parkinson's disease, primary autonomic failure, or other neurodegenerative diseases. Notably, Northera has been on the market in Japan since 1989. Chelsea hoped that based on its development efforts and studies, the FDA would approve Northera for sale in the United States.

1

There was significant basis for Chelsea's optimism that its New Drug Application would be approved. The FDA recognized that Northera addressed a critical unmet medical need in a limited patient population and accorded it "orphan drug" status and fast-track review. Particularly significant, the FDA agreed to a "Special Protocol Assessment," which is a binding agreement that Chelsea's study design, including trial size, clinical endpoints and/or data analyses were acceptable to support approval. The FDA's independent expert advisory committee reviewed the results of Chelsea's studies and recommended to the FDA that it approve Northera.

The FDA concluded that Chelsea needed to conduct an additional clinical trial to conclusively demonstrate Northera's clinical benefit. Notwithstanding this setback, Chelsea has steadfastly endeavored to obtain FDA approval of Northera and ultimately succeeded in obtaining FDA approval of Northera on February 18, 2014.

Plaintiff brought this action when Chelsea's stock dropped following the FDA's response, alleging that Defendants engaged in securities fraud. Where, as here, a securities fraud action is subject to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a) *et seq.* ("Reform Act"), a plaintiff must plead a strong inference of scienter. The District Court found that Plaintiff failed to meet this rigorous standard for multiple reasons. In particular, Plaintiff failed to support

2

its primary allegation that Defendants knew the FDA would not approve Northera because it had supposedly told Chelsea that two successful trials would be necessary for approval. But Plaintiff concedes two trials are not always required and national data confirms that more than a third of novel therapeutic agents are approved on the basis of a single pivotal trial. Defendants hardly misled their investors on this point where they expressly warned that the FDA usually requires two studies, the FDA might require additional evidence of clinical efficacy, and that Northera might not be approved.

Further belying the alleged fraud is that no individual defendant sought to personally profit from it. The individual defendants owned millions of shares of Chelsea stock but did not sell a single share during the Class Period and thus suffered much greater losses than Plaintiff. One even *bought* stock during the period of alleged artificial inflation. Courts routinely consider such facts and find they negate scienter. The District Court did not err in doing so. Unable to plead any stock sales, Plaintiff alleged that Defendants misled investors because the Company "desperately" needed cash from stock offerings. But this Court in *Cozzarelli* squarely found that theory of motive not cognizable.

Notably, Chelsea spent millions of dollars in research and development on Northera – and far more on Northera than any other drug. On similar facts, this Court in *Cozzarelli* found it "improbable" that a pharmaceutical company "would

stake its existence on a drug and a clinical trial that the company thought was doomed to failure." 549 F.3d at 628. The same is true here.

In sum, none of the grounds that the Appeal advances support scienter. In fact, the Appeal abandons numerous allegations made below, making manifest they were baseless. The failure to plead a strong inference of scienter is case dispositive. This Court should affirm the Judgment and dismiss the Appeal.

## JURISDICTIONAL STATEMENT

Defendants concur with Plaintiff's statement of jurisdiction.

## ISSUES PRESENTED

1. Whether Plaintiff pleaded a strong inference of scienter as required by the Reform Act where there were multiple undisputed facts that defeated any inference of scienter.

2. Whether the District Court erred in taking judicial notice of SEC filings where the Complaint relied on SEC filings and courts, including the Fourth Circuit, routinely take such review on motions to dismiss in securities cases.

3. Whether Plaintiff pleaded that statements about the FDA's briefing report were actionable where the report was not final or binding on the FDA, Chelsea accurately described numerous concerns contained in the report, and told investors how they could obtain the full report within eight days when the FDA posted the report on its website.

4

# STATEMENT OF THE CASE

**A.    Nature Of The Case**

Plaintiff alleged that Defendants made false and misleading statements from November 3, 2008 until March 28, 2012 ("Class Period") about the development of Northera. Plaintiff asserted that Defendants violated Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 (15 U.S.C. §§ 78j(b), 78t(a), and 17 C.F.R. § 240.10b-5, respectively).

**B.    Course and Disposition Of Proceedings**

The Consolidated Securities Class Action Complaint ("Complaint") was filed on October 5, 2012. Joint Appendix ("JA") at 19. Defendants moved to dismiss the Complaint on November 16, 2012. JA-14. The District Court held a hearing on June 19, 2013 (JA-377), dismissed the Complaint with prejudice on October 10, 2013 (JA-398) ("Order"), and entered Judgment on November 12, 2013 (JA-410).

**C.    Factual Background**

**1.    The Defendants, Neurogenic Orthostatic Hypotension, And Northera**

Chelsea is a development stage pharmaceutical company based in Charlotte whose main drug candidate is Northera. JA-19: ¶18. Defendants Dr. Simon

Pedder served as Chelsea's CEO and Dr. William Schwieterman served as  Vice

President and Chief Medical Officer.  JA-19: ¶¶19-22.[1]

Northera is a drug for the treatment of symptomatic neurogenic orthostatic

hypotension in patients suffering from neurodegenerative disorders such as

primary autonomic failure, Parkinson's disease, multiple systems atrophy, and pure

autonomic failure, among other diseases.  JA-19: ¶18; JA-233.  Orthostatic

hypotension ("OH") is a profound drop in blood pressure that occurs when a

person stands.  The condition compromises blood flow to the brain and other parts

of the body.  *See* JA-19: ¶41; JA-233.  Neurogenic OH ("NOH") is a subtype that

results from an attenuated norepinephrine response to standing.  *See* JA-19: ¶41.

Symptoms include dizziness, lightheadedness, blurred vision, fatigue, and poor

concentration.  In more serious cases, patients may faint, which can lead to serious

injury and long-term disability.  *See* JA-19: ¶¶41-42.  Currently, there are no

approved therapies with demonstrated clinical benefit for the treatment of NOH,

and existing treatments have numerous side effects.  JA-19: ¶43.  The FDA thus

determined that there "is a significant unmet need" for a drug "proven to provide

---

[1] Along with Drs. Pedder and Schwieterman, the Complaint named Dr. Arthur
Hewitt, Chelsea's Vice President and Chief Scientific Officer, and Nick Riehle,
Vice President and Chief Financial Officer (collectively "Individual Defendants").
Plaintiff "dropped" Dr. Hewitt and Mr. Riehle on appeal (AOB2 n.1) and
Judgment in their favor is now final.

clinical benefit (*i.e.*, reduction in symptoms and their impact on the ability of patients to perform activities of daily living)." *Id.*

Droxidopa (the scientific name for Northera) has been approved in Japan for the treatment of neurogenic orthostatic hypotension since 1989, and that approval was expanded in 2000. JA-19: ¶¶18, 44. Chelsea licensed droxidopa in 2006 from the company that markets the drug in Japan. JA-19: ¶45.

## 2.    The FDA's Drug Approval Process

Following development and testing of a drug, an Investigational New Drug Application may be sought to approve clinical trials using human subjects. *See* 21 C.F.R. § 312, *et seq*. Clinical trials are then conducted to determine the drug's dosing, assess its efficacy, and monitor its safety. *See id.* § 312.21. If the clinical trials show a basis for seeking approval, a New Drug Application ("NDA") is submitted to obtain FDA approval. 21 U.S.C. § 355(a). Within 60 days, the FDA makes "a threshold determination that the application is sufficiently complete to permit a substantive review." 21 C.F.R. § 314.101. The FDA evaluates the NDA and then either approves the drug, issues a "complete response letter" asking for more information, or denies the application. *Id.* § 314.100. The FDA may convene an expert advisory committee to consider whether a drug's health benefits outweigh its risks and to issue a non-binding recommendation to the FDA. *See id.* §§ 14.160, 14.171.

7

### 3.    Chelsea's Lengthy Interaction With The FDA

Chelsea engaged with the FDA over a five year period on the design and results of five clinical trials of Northera. In January 2007, the FDA granted Orphan Drug Status for Northera for the treatment of NOH. Orphan Drug Status is reserved for drugs that treat a rare disease afflicting less than 200,000 patients per year in the United States. JA-19: ¶45; *see* 21 U.S.C. § 360bb. The FDA also granted Northera Fast-Track Status, which accelerates the review process for drugs that treat serious or life-threatening conditions for which there is an unmet medical need. JA-19: ¶45.

**The Studies And The FDA's Grant Of A Special Protocol Assessment**. Study 302 was a Phase III, multi-center, multi-national, randomized-withdrawal, placebo-controlled, parallel group, double-blind study that commenced on February 1, 2008 and concluded on August 10, 2009. JA-19: ¶49. Its primary pre-determined goal or endpoint was Item 1 (dizziness) of the Orthostatic Hypotension Symptom Assessment ("OHSA") scale, which consisted of six questions designed to measure the intensity of symptoms of a patient with NOH. JA-19: ¶¶47, 50. The OHSA was developed along with the Orthostatic Hypotension Daily Activity Scale ("OHDAS"); together they comprised a single scale designed specifically to measure the symptoms of NOH – the Orthostatic Hypotension Questionnaire

8

("OHQ").  JA-19: ¶47.  Chelsea announced on September 24, 2009 that Study 302 failed to meet statistical significance on its primary endpoint.  JA-19: ¶78.

Study 301 was a Phase III, multi-center, multi-national, randomized, placebo-controlled, parallel group, double-blind study that commenced on August 22, 2008 and was completed on July 23, 2010.  JA-19: ¶48.  Significantly, in February 2008, "Chelsea reached an agreement with the FDA on a Special Protocol Assessment ("SPA") for the design of Study 301."  JA-19: ¶76.  As Plaintiff admits, this process:

> allows for FDA evaluation of a clinical trial protocol intended to form the primary basis of an efficacy claim in support of a new drug application, and provides a *binding agreement* that the *study design, including trial size, clinical endpoints and/or data analyses are acceptable to support regulatory approval*.

*Id*. (emphasis added).  Initially, Study 301's primary endpoint was the same as in Study 302 (Item 1 of the OHSA).  JA-19: ¶77.  In November 2009, the FDA permitted Chelsea to change the primary endpoint to "the relative mean change in the OHQ score between droxidopa and placebo."  JA-19: ¶80; JA-176.  Following the change in Study 301 with the OHQ as its primary endpoint, the FDA confirmed that the SPA for Study 301 was still in effect.  JA-186; *see* JA-195.

On September 20, 2010, Chelsea announced that the preliminary analysis showed Study 301 met its primary endpoint with a statistical improvement (p=0.003) over placebo for the composite OHQ in symptoms associated with

9

NOH.  JA-19: ¶¶52, 83.  The result on OHSA Item 1 was also highly statistically significant (p<0.001).  JA-223-24.

Study 303 was an open-label, longer-term, three month trial designed to generate additional long-term safety data.  JA-19: ¶¶51, 90, 130.  The study did not demonstrate efficacy.  JA-19: ¶51.  Studies 304 and 305 were safety studies only and did not purport to address efficacy.  JA-19: ¶47.[2]

### 4.    Evaluation Of Chelsea's NDA

Following preliminary statistically significant results from Study 301, Chelsea announced on December 20, 2010 that it had completed a pre-NDA assessment with the FDA and would accelerate its NDA.  JA-19: ¶85; JA-233.  The FDA agreed that the proposed NDA could be submitted based on the data from Studies 301 and 302, without requiring further efficacy studies.  JA-370-71, 375-76.  On September 28, 2011, Chelsea announced its submission of an NDA to the FDA based on the data in Studies 301 and 302.  JA-19: ¶89.

As part of the evaluation process, a member of the FDA staff prepared a briefing report which became public on February 21, 2012 (JA-19: ¶101) ("Briefing Document").  The Briefing Document recommended against approval

---

[2] Study 306 had the same endpoint as the revised Study 301 but was abandoned as unnecessary following the pre-NDA assessment with the FDA.  JA-19: ¶¶82, 85.

of droxidopa. That recommendation did not constitute a final decision, and was not binding on the FDA's Independent Advisory Committee or the FDA. JA-19: ¶100; JA-373.

Eight days before the Briefing Document became public, Chelsea issued a press release on February 13, 2012 as an update in advance of the FDA's anticipated review and action on the NDA expected by March 28, 2012. The press release noted that the FDA's Independent Advisory Committee of experts in the field ("Independent Advisory Committee") was scheduled to meet on February 23 to discuss its review of the NDA and announce its recommendation. JA-248. The press release noted that Chelsea had received the Briefing Document and that Chelsea's CEO, Dr. Pedder, would be discussing an overview of the key issues that morning at a separate conference. *Id*. The press release described a number of concerns expressed in the Briefing Document (JA-19: ¶¶100, 154; JA-248-50) and provided a link to the FDA website where the public would be able to access the report in its entirety on February 21 (JA-250).

The FDA's Independent Advisory Committee disagreed with the Briefing Document's recommendation against approval. JA-255. After considering presentations by Chelsea and FDA staffers, the Independent Advisory Committee

11

voted on February 23, 2012 to recommend FDA approval of Northera.[3]  JA-255,

258.  Chairperson Dr. A. Michael Lincoff, a Vice Chairman of Cleveland Clinic's

Department of Cardiovascular Medicine, stated that "there is no question in my

mind that this drug is efficacious."  JA-203.  Dr. Vasilios Papademetriou of

Georgetown University stated:

> I voted yes, for the same reasons that Dr. Lincoff mentioned.  I think
> this is a devastating disease, and for those who have it, this makes
> their life unbearable.  And we don't have an effective therapy for
> these patients at this time.
>
> So I'm making available a drug that can help, admittedly, not
> all of them, but some of them; it's very, very important.  And I could
> not in a clear conscience vote no and deprive those patients from the
> benefits they can derive at this point from this medication.

JA-204.

### 5.    The FDA's Complete Response Letter

The FDA was not bound by either the Briefing Document or the

Independent Advisory Committee's recommendations.  On March 28, 2012, the

FDA issued a Complete Response Letter advising Chelsea that Northera would not

be approved at the time.  Chelsea immediately reported the FDA's response, the

need to submit an additional study to support the efficacy including durability of

---

[3] The vote was 7-4 in favor, with one abstention, and one not voting.  JA-19:
¶110.

effect over a 2 to 3 month period, and the Company's intent to continue to work with the FDA toward approval.  JA-19: ¶114.

The first securities lawsuit was filed on April 4, 2012.  Notwithstanding, Chelsea has continued to seek approval of Northera.  On February 18, 2014, the FDA granted approval of Northea.[4]

### 6.     The District Court's Decision On Defendants' Motion To Dismiss

Defendants moved to dismiss the Complaint on the grounds that it failed to satisfy the Reform Act's stringent pleading requirements for falsity and scienter and that the Reform Act's Safe Harbor immunized Chelsea's forward-looking statements.  The District Court held that it did not need to resolve whether Plaintiff adequately pleaded the existence of a false and misleading statement because the Plaintiff failed to meet the Reform Act's requirement to "'state with particularity facts giving rise to a strong inference that the defendant acted' with scienter." Order, JA-402 (citing 15 U.S.C. § 78u-4(b)(2)).

Plaintiff's primary allegation was that Defendants misled investors by failing to disclose that the FDA advised it required two studies to approve the NDA and that Defendants were motivated to do so in order to "stave off bankruptcy and fund

---

[4] Chelsea Therapeutics Announces FDA Accelerated Approval of Northera (Droxidopa) for the Treatment of Symptomatic NOH, Business Wire (Feb. 18, 2014), *available at* http://www.businesswire.com/news/home/20140218006891/en.

13

clinical trials." *See* Order, JA-403. The District Court found the factual allegation

insufficient and the motive theory not cognizable under Fourth Circuit precedent.

Chelsea repeatedly warned that the FDA might find the NDA insufficient for

approval for multiple reasons. None of the Individual Defendants was alleged to

have sold any stock, and one bought substantial shares of stock during the Class

Period. The District Court concluded that Plaintiff failed to plead that inculpatory

inferences were as strong as nonculpable inferences. The District Court dismissed

with prejudice, finding that amendment would be futile.

## STANDARD OF REVIEW

This Court reviews de novo the dismissal for failure to state a claim under

Federal Rule of Civil Procedure 12(b)(6). *Teachers' Ret. Sys. v. Hunter*, 477 F.3d

162, 168, 170 (4th Cir. 2007); *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d

338, 342 (4th Cir. 2003).

## SUMMARY OF ARGUMENT

**No Inference Of Scienter.** The District Court held that it did not need to

reach the issue of falsity where Plaintiff failed to meet the Reform Act's

requirement that he plead a strong inference of scienter. The District Court based

its decision on a number of factors, including that Plaintiff did not support its

fundamental contention that the FDA specifically required two successful studies

in order to approve the NDA. In contrast to Plaintiff's flawed allegation, the

14

District Court considered facts that belied scienter, including Defendants' warnings that the FDA usually requires two studies and that the NDA might not be sufficient.

Significantly, the Complaint failed to allege that any of the Individual Defendants sold Chelsea stock during the Class Period, a period when they were allegedly artificially inflating the stock. One Individual Defendant actually bought additional shares of stock during the Class Period. Similarly, the Company expended millions to develop the drug and prepare for its commercial launch, which would have made no sense if the Defendants believed the NDA would not be approved as submitted. The Fourth Circuit has found similar facts inconsistent with scienter. Unable to plead that any Individual Defendant benefitted financially from their supposed acts to inflate Chelsea's stock, Plaintiff relied on a motive theory of fraud premised on the notion that Chelsea desperately needed cash from stock offerings in order to run its development efforts. As the District Court correctly concluded, the Fourth Circuit squarely rejected this identical theory in *Cozzarelli*.

Notably, the Appeal abandons the Complaint's reliance on "confidential witnesses." This abandonment implicitly recognizes that those witnesses did not support Plaintiff's allegations of fraud. Significant facts, including the FDA's grant of an SPA for Study 301 and that Study's achievement of its primary

15

endpoint with statistical significance, contradicted the witnesses' unsupported opinions. For all these reasons, Plaintiff failed to meet its pleading burden and dismissal on this basis was proper. *See* Sections IIA-D, *infra*.

**No Error Based On Judicial Notice**. The Appeal spills much ink to argue that the District Court erred by taking judicial notice with respect to Chelsea stock issues. Even if the District Court had erred, its holding that Plaintiff failed to raise a strong inference of scienter is unassailable given the numerous factors supporting that conclusion, even disregarding the stock issues. But there was no error. The Appeal disregards the fundamental fact that no judicial notice of any SEC filing was necessary to establish an absence of stock sales during the Class Period because the Complaint itself made no allegation. Chelsea's proxy statement showed the Individual Defendants' stock holdings and the Form 4s showed Dr. Schwieterman's stock purchases during the Class Period. A court's review of these SEC filings is perfectly proper. Numerous courts, including the Fourth Circuit, routinely examine such SEC filings in the motion to dismiss context to consider stock holdings, stock purchases, and the percentage of shares sold relative to available holdings. *See* Section IIE, *infra*.

**No Actionable Statement Based On Briefing Document**. The Appeal maintains that the District Court erred by not ruling on whether Defendants made a false or misleading statement about the FDA's Briefing Document. There was no

16

error where the Court examined the Complaint's allegations and found they failed to raise a strong inference of scienter.  The allegations concerning the Briefing Document failed to show Chelsea's statements were false or misleading or made with scienter, and this Court may affirm on this alternative ground.  Contrary to Plaintiff's suggestion, Chelsea accurately disclosed a number of the report's concerns on droxidopa and the NDA; stated it would work with the FDA to address its questions; and warned that its development program might not adequately establish a durable treatment effect.  Plaintiff never explains why Chelsea would mislead investors given the report's *public release eight days later*.  Indeed, Chelsea provided a link to the FDA website where the public could access the report in full, which action belies any intent to mislead investors or conceal negative information.  *See* Section III, *infra*.

**No Challenge To Dismissal With Prejudice**. The Appeal does not challenge the dismissal with prejudice, for good reason.  Plaintiff failed to make a motion for leave to amend, and failed to make any effort to show how an amendment would cure the defects that were in the Complaint.  The District Court did not abuse its discretion in finding that amendment would be futile.  *See* Section V, *infra*.

17

# ARGUMENT

## I.  THE STANDARDS APPLICABLE TO THIS REFORM ACT CASE

A securities fraud plaintiff must meet "demanding" elements which show that: "'(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages.'" *Cozzarelli*, 549 F.3d at 623 (quoting *Teachers'*, 477 F.3d at 172).  The mental state in a securities fraud action is either "intentional misconduct" or "recklessness" such that the danger of misleading investors was either "'known to the defendant or so obvious that the danger must have been aware of it.'" *Ottmann*, 353 F.3d at 343-44 (citation omitted).

A plaintiff also must meet the "[e]xacting pleading requirements" that the Reform Act imposed. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  In enacting the Reform Act, Congress was concerned that "if not adequately contained" securities fraud actions "can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Id.*[5]  Accordingly, the Reform Act "'unequivocally raise[d] the bar'"

---

[5] *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 82 (2006) (The Reform Act places "special burdens" on securities class action plaintiffs in an "effort to deter or at least quickly dispose of those suits whose nuisance value outweighs their merits.").

18

with respect to pleading scienter. *Tellabs*, 551 U.S. at 317, 321 (alteration in original) (citation omitted). A plaintiff must "state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). *Tellabs* explained that to raise the required strong inference of scienter, factual allegations must be "cogent," "compelling," "persuasive," "effective," and "powerful." 551 U.S. at 314, 324. To assess scienter, a court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id*. at 323-24. To prevail, a plaintiff must plead that the inference of scienter is "at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 314, 324; *see Cozzarelli*, 549 F.3d at 623-24. When the facts "more plausibly suggest that the defendant acted innocently – or even negligently" the "action must be dismissed." *Cozzarelli*, 549 F.3d at 624.

With respect to falsity, a plaintiff must identify specific statements and explain either why they were false or how any omitted facts made those statements misleading. *See Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999). Here, too, the Reform Act "establishes strict requirements for pleading falsity with specificity." *Cozzarelli*, 549 F.3d at 625. The Reform Act requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or

19

omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

The Reform Act mandates that if a complaint fails to meet the pleading requirements, the court "shall . . . dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A). The Complaint below met none of these requirements.

## II.    PLAINTIFF FAILED TO RAISE A STRONG INFERENCE OF SCIENTER

As the District Court held, Plaintiff failed to plead a strong inference of scienter based on a number of factors. Fundamentally, Plaintiff's effort to directly plead scienter – on the theory that the FDA told Defendants two studies would be required for Northera's approval – was insufficient. Plaintiff also failed to plead scienter indirectly and circumstantially. Plaintiff relied on a theory of motive that the Fourth Circuit rejected in the strikingly similar *Cozzarelli* decision. The instant case is even weaker than *Cozzarelli* because there were no alleged stock sales by any Individual Defendant, and Dr. Schwieterman purchased additional shares, all during a period of alleged artificial inflation. For these and other reasons, dismissal was required.

### A.    Plaintiff Did Not Adequately Support Its Fundamental Premise That The FDA Told Defendants Two Trials Would Be Required

The Complaint's primary allegation was that statements referencing the submission of the NDA based on Studies 301 and 302 (JA-19: ¶¶135-137, 141-

145, 150-152), and those discussing the Advisory Committee Meeting (JA-19:

¶¶156-158), were false and misleading because the FDA told Chelsea that two

trials would be required and that "'one trial is not *usually* sufficient for approval.'"

JA-19: ¶138(a) (emphasis added); *see id.* ¶¶9, 97, 102, 153(b), 159(b); AOB35-38.

The very documents that Plaintiff relied on belied this allegation and undermined

Plaintiff's attempt to plead scienter.

The Briefing Document itself recognized results from Study 301 were

"highly statistically significant":

> The results on both OHSA Item 1 and OHQ *were highly statistically significant* [p < 0.001 for OHSA Item 1 (effect size 1.3) and p = 0.003 for OHQ (effect size 0.9].

JA-376 (emphasis added).  The Briefing Document also stated:

> *[T]here is an SPA for Study 301 whereupon it was agreed that a highly significant outcome (P<0.00125) in this one trial might be sufficient for approval.*

JA-375 (emphasis added).

Dr. Robert Scott, an industry representative who participated at the

Cardiovascular and Renal Drugs Advisory Committee Meeting on February 23,

2012, likewise noted the relationship between the strong results of Study 301 and

the SPA:

> I assume that the sponsor discussed the question of approval based on a single pivotal as part of the SPA application.  *So given that study 301 was a clear win, the terms of the SPA didn't cover that?*

21

JA-367 (emphasis added). Dr. Steve Graham, the FDA's Deputy Director of the
Division of Cardiovascular and Renal Products, and Dr. Robert Temple, an FDA
participant, did as well:

> The question was . . . was this study in and of itself going to be
> sufficient, if successful, to support an application? And we never
> know what the answer is. As Norman [Stockbridge, FDA Director,
> Division of Cardiovascular and Renal Drug Products] says, *an
> overwhelming effect in one study, you'd be a fool not to approve it*.
>
> Dr. Temple: That's the point I'm making, Steve. We said we expect
> two studies. That's true. We do. *It didn't say, there's no possibility
> that one study will* –
>
> Dr. Graham: *That's correct*.

JA-370-71 (emphasis added). Dr. Pedder disclosed to investors that the FDA
usually requires two studies but "said that a program with one clinical study that
has a very robust p value could be sufficient for a filing." JA-156. Dr. Pedder's
statement got it right.

The District Court reviewed the exchange from the Advisory Committee
meeting. The Court rejected Plaintiff's argument that the FDA required two
successful studies and that "the defendants' communications with the FDA
regarding the Northera NDA establish a showing of recklessness." Order, JA-404.
The District Court stated that "[w]hile the briefing committee transcript is certainly
not a model of clarity of the FDA's NDA requirements, *it casts significant doubt*

22

*on plaintiff's contention that one successful study would not be sufficient.*"  *Id.* (emphasis added).[6]

The District Court also emphasized that "there is clear statutory authority that 'data from one adequate and well-controlled clinical investigation and confirmatory evidence' may be sufficient for approval.'"  Order, JA-404; JA-19: ¶92.[7]  The Appeal concedes as much (AOB8-9) and admits that the Complaint did "not allege that the FDA would *never* approve drug applications based on one efficacy study" (AOB42).

---

[6] *See Sarafin v. BioMimetic Therapeutics, Inc.*, No. 3:11-0653, 2013 WL 139521, at *11 (M.D. Tenn. Jan. 10, 2013) (that the FDA told company "to give 'serious consideration' to certain matters and said several things that should be done, does not mean that the approved protocol was somehow rejected" (citations omitted)).

[7] 21 U.S.C. § 355(d) provides in relevant part:

> If the Secretary determines, based on relevant science, that data from one adequate and well-controlled clinical investigation and confirmatory evidence (obtained prior to or after such investigation) are sufficient to establish effectiveness, the Secretary may consider such data and evidence to constitute substantial evidence. . . .

*See* Christopher-Paul Milne, *The Single Controlled Trial: Industry Survey Indicates that Implementation is Still a Work in Progress*, 36 Drug Information J. 291, 219 (2002) ("The Food and Drug Administration Modernization Act of 1997 amended the standard for approval for effectiveness by providing that under certain circumstances, one adequate and well-controlled clinical investigation and confirmatory evidence would be sufficient.").

23

Plaintiff could not possibly contend otherwise.  The fact is that between 2005 and 2012, *36.8%* of novel therapeutic agents approved by the FDA *were based on a single pivotal trial*.[8]  It would have been illogical for Chelsea to have submitted its NDA, and for the FDA to have accepted that submittal, on the basis of a "highly statistically significant" Study 301 and an unsuccessful Study 302 if the FDA had believed or told Chelsea that approval could never be obtained on that basis.  JA-19: ¶85.

Notably, that the FDA typically requires two trials but can approve an application on one successful trial pursuant to its statutory authority *is not a fact that required disclosure*.  As Dr. Temple stated:

> Everybody should know that when we agree to file an NDA on the basis of a single study, that doesn't reflect a conclusion that one study is going to do the job.  It means that we will consider whether it does or not.

JA-368; *see Raab v. Gen. Physics Corp.*, 4 F.3d 286, 291 (4th Cir. 1993) (there was "no duty to advise investors of what was already commonly known"); *Ward v. Succession of Freeman*, 854 F.2d 780, 792-93 (5th Cir. 1988) (because passage of

---

[8] Nicholas S. Downing, *et al.*, Clinical Trial Evidence Supporting FDA Approval of Novel Therapeutic Agents, 2005-2012, 311(4); 367 at 368 (Journal of Am. Med. Ass'n 2014).

statute is "a matter of law in the public domain," there was no duty of disclosure).[9]

The Appeal contends that the District Court drew improper inferences, "[g]iven Study 301's shortcomings." AOB42. This argument fails. There is no allegation that Defendants made false statements about the results of Study 301 or any other study. Similarly, Chelsea indisputably disclosed that Study 302 did not meet its endpoint. JA-19: ¶78. Chelsea expressly warned when filing its NDA that there was "no assurance that the FDA . . . will not require additional clinical efficacy to support approval of our NDA." JA-141. As discussed *infra*, the District Court noted "the numerous warnings that Chelsea gave investors." Order, JA-404-05. For all these reasons it concluded that Defendants' "optimism does not rise to the level of recklessness articulated in *Phillips* [*v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999)]."[10]

---

[9] *See also Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 515 (7th Cir. 1989) ("issuers need not estimate the chance that a federal agency will change its rules or tighten up on enforcement"); *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 759 (7th Cir. 2007) (no duty to "'disclose' information that is already in the public domain").

[10] Plaintiff's cited authorities (AOB41-43, 45, 50-51), in which FDA records *supported* knowledge of adverse FDA determinations, have no application here. *Cf. In re CV Therapeutics, Inc.*, No. C 03-03709 SI, 2004 WL 1753251, at *1-2 (N.D. Cal. Aug. 5, 2004) (statement of scheduled advisory committee review of drug application was contradicted by FDA's finding of "major deficiencies" with the application; FDA and committee had not decided to go forward with the review); *In re Amylin Pharm., Inc. Sec. Litig.*, No. 01 cv 1455 BTM(NLS), 2003 (continued...)

25

### B.    Plaintiff Relied On A Theory Of Fraud That The Fourth Circuit Squarely Rejected

The Complaint alleged that Defendants were motivated to commit fraud because "Chelsea desperately needed . . . cash [from stock offerings] during the Class Period." JA-19: ¶56.  Thus, maintaining an inflated stock price at the time of the offerings was "essential to Chelsea's ability to maximize the ability to raise the capital it needed to fund its development efforts, commercialization and marketing activities for Northera." JA-19: ¶166.  "These offerings would have been negatively impacted if the truth about the . . . tenuous chances of achieving FDA approval . . . were actually disclosed." *Id*.[11]  The Fourth Circuit rejected similar

---

(...continued from previous page)

U.S. Dist. LEXIS 7667, at *4-5 (S.D. Cal. May 1, 2003) (statements that "comprehensive data" and clinical testing were "'sufficient to support'" FDA approval were contradicted by FDA minutes finding study designs were "'inconsistent with clinical practice'" and study data were "'not considered pivotal data for an NDA'" (citations omitted)); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 806 (C.D. Cal. 2012) (assurance that company had "vetted" its studies with the FDA and had pre-approved the company's approach was contradicted by fact that FDA had not approved the studies and ultimately rejected them as inadequate).   Notably, none of the companies in these cases had received an SPA or a recommendation for approval from an independent advisory committee.

[11] *See* JA-19: ¶¶56-57 (Chelsea's auditor, E&Y, "issued a going concern opinion" in Chelsea's publicly filed Form 10-K for 2008 which Chelsea also acknowledged on February 26, 2010; Chelsea "made no secret of the fact that . . . FDA approval . . . and ultimate commercialization of Northera was critically important to the Company's future").

26

allegations in *Cozzarelli:*

> [A] strong inference of fraud does not arise merely from seeking capital to support a risky venture. Indeed, the motivations to raise capital or increase one's own compensation are common to every company and thus add little to an inference of fraud.

549 F.3d at 628 (citing *Ottmann*, 353 F.3d at 352). The Court explained that investment risk is particularly strong "in a field like biopharmaceuticals" (*id.*) and further observed:

> If we inferred scienter from every bullish statement by a pharmaceutical company that was trying to raise funds, we would choke off the lifeblood of innovation in medicine by fueling frivolous litigation – exactly what Congress sought to avoid by enacting the PSLRA.

*Id.* Inexplicably, Plaintiff failed to address *Cozzarelli* below.

The Appeal belatedly argues that the District Court's reliance on *Cozzarelli* was erroneous because *Cozzarelli* involved only "generic" and "conclusory allegations" of motive. AOB48-49. The Appeal argues that in contrast to *Cozzarelli*, "Chelsea was in survival mode." AOB49. This argument is specious where the plaintiff in *Cozzarelli* alleged:

- Inspire [the Company defendant] was "hemorrhaging cash and reporting ever increasing net losses"; [12]

---

[12] *In re Inspire Pharm., Inc. Sec. Litig.*, 515 F. Supp. 2d 631, 636, 639 (M.D.N.C. 2007), *aff'd*, 549 F.3d 618 (4th Cir. 2008).

27

- Inspire "conducted two offerings . . . to finance its development of diquafosol";[13]

- Inspire was motivated to make misleading statements about its drug under development "because the company needed to raise money to fund its operations";[14]

- "Inspire was losing money in 2004 and needed to raise capital";[15]

- diquafosol was the "'lead development product' on which Inspire's future as a company depended."[16]

The District Court correctly relied on *Cozzarelli* and found that "[t]he Fourth Circuit is quite clear that plaintiff's principal theory of scienter simply does not satisfy the PSLRA's heightened pleading requirements."  Order, JA-403-04.

**C.    The Appeal Abandons Reliance On Confidential Witnesses**

The Complaint relied on three supposed "confidential witnesses" ("CWs") who offered only vague, subjective opinions and critically lacked any interaction

---

[13] *Id.*

[14] *Cozzarelli*, 549 F.3d at 627.

[15] *Id.*

[16] *Id.*

with the Individual Defendants.  The CWs could not possibly raise a strong inference of scienter and the *Appeal does not even mention them.*

CW1, a Medical Science Liaison hired in August 2011, purportedly attended a three day meeting, viewing slides of data from the clinical trials.  JA-19: ¶¶28-29. CW1 allegedly "realized the flawed nature of the data," believed the "'science . . . was weak,'" that Chelsea "'lack[ed] data on the long term effects' of droxidopa," and that the NDA presented the "'bare minimum' required by the FDA to *submit* an NDA."  JA-19: ¶¶29-30.  CW2, an "Assistant Professor at a university associated with a principal investigator who worked on Studies 301 and 302," purportedly believed that the OHQ "was a 'subjective tool'"; that Studies 301 and 302 "failed to prove that droxidopa had a long-lasting . . . benefit"; that they "'didn't meet the same endpoints'" or "'the regular thresholds for approval of a regular drug.'"  JA-19: ¶¶31-33.  CW3, a Senior VP and Director of Scientific Strategy for a healthcare company hired to review data from Studies 301 and 302, purportedly believed these studies "'weren't strong enough to support approval'"; lacked sufficient safety data and "did not show the long-term effects"; and "'wasn't impressed with the trials.'"  JA-19: ¶¶34-36.

Courts reject witness opinions that are vague.  *See N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 52 n.18 (1st Cir. 2008) (rejecting "bald assertion" of opinion that defendants were "'excessively

aggressive'" in getting a new drug to market, which opinion "gets plaintiffs nowhere" (citation omitted)).[17]  This is true in the medical arena as well.  *See In re Medimmune, Inc., Sec. Litig.*, 873 F. Supp. 953, 966 (D. Md. 1995) ("[m]edical researchers may well differ over the adequacy of given testing procedures and in the interpretation of test results").[18]

The CWs also ignored significant facts:

- the FDA granted an SPA for Study 301 and indisputably recognized that endpoints may be "subjective";[19]

---

[17] *See also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 999 (9th Cir. 2009) ("At best, CW1's account establishes 'disagreement and questioning within [Digimarc] about the [accounting numbers]'" (alterations in original) (citation omitted)); *In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 573, 578, 588 (W.D. Va. 2006) (CW's statements are based on "speculation and opinion"; that defendant was motivated by greed is "the opinion of one witness" and "are not facts"; CW "offers no quantification of these 'large' deals").

[18] *See also In re Vertex Pharm., Inc., Sec. Litig.*, 357 F. Supp. 2d 343, 355 (D. Mass. 2005); *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1225 (S.D. Cal. 2001).

[19] *See Cozzarelli*, 549 F.3d at 621 ("The FDA generally requires . . . trials [with] 'endpoints' [that] may be either subjective or objective"; noting subjective endpoint could be "itchiness of the eye"); *see* JA-19: ¶74 ("Defendant Pedder admitted that the OHQ was an inherently subjective assessment").

30

- the Briefing Document acknowledged FDA agreement that a "highly significant outcome (P<0.00125) in this one trial might be sufficient for approval" (JA-375-76);

- Study 301 "achieved its primary endpoint: a clinically meaningful and statistically significant benefit" (JA-19: ¶¶47-48, 52 & n.5; JA-376);[20]

- the vote of the Independent Advisory Committee in favor of approving droxidopa;[21] and

- droxidopa has been on the market in Japan since 1989.[22]

---

[20] *See Cozzarelli*, 549 F.3d at 628 (earlier study's achievement of corneal clearing "bears more significantly on defendants' outlook regarding [the ongoing study] than statements from anonymous doctors who said that corneal clearing was nearly impossible to achieve").

[21] *See Sarafin*, 2013 WL 139521, at *16 (dismissing complaint; favorable advisory committee "recommendation which gave some credence to BMTI's prior optimism"); *In re Cyberonics Inc. Sec. Litig.*, No. H-05-2121, 2006 U.S. Dist. LEXIS 50500, at *23-24 (S.D. Tex. July 20, 2006) (dismissing complaint where plaintiffs' allegations were "greatly undermined" by the advisory committee's vote to recommend the device for approval).

[22] Courts have found that approval of a drug in other developed nations can "vindicate[]" defendants' optimistic statements about the product, even when the FDA *subsequently* declines to approve it. *DeMarco*, 149 F. Supp. 2d at 1231; *Sarafin*, 2013 WL 139521, at *16; *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 471 (S.D.N.Y. 2008), *aff'd sub nom. State Univs. Ret. Sys. v. Astrazeneca PLC*, 334 F. App'x 404 (2d Cir. 2009); *Oppenheim Pramerica Asset Mgmt. S.a.r.l. v. Encysive Pharm., Inc.*, No. H-06-3022, 2007 U.S. Dist. LEXIS 69121, at *15 (S.D. Tex. Sept. 18, 2007).

31

Last but not least, the CWs had no purported interaction with any Individual Defendant, making them incapable of supporting scienter. *See In re Conventry Healthcare, Inc. Sec. Litig.*, No. 08:09-CV-2337-AW, 2011 WL 1230998, at *6 (D. Md. Mar. 30, 2011) (where no witness had direct contact with defendants, "it defies logic to conclude that these witnesses knew what the Defendants knew or recklessly disregarded").[23]

The Appeal's omission of the CWs implicitly recognizes that they undermined, rather than supported scienter. Chelsea hired and trained people such as CW1 in 2011 "along with [15] to [20]" others to "make contact with cardiologists and neurologists" to "raise awareness" and "condition the market should the FDA approve droxidopa's NDA." JA-19: ¶¶28-29. Chelsea hired CW3 to "educate physicians and providers about droxidopa and promote the drug in scientific and medical literature." JA-19: ¶34. In so doing, Defendants' conduct was consistent with the belief that Northera would be approved.[24]

---

[23] *See also Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*, No. 5:11-cv-4-D, 2013 WL 1192004, at *12 (E.D.N.C. Mar. 22, 2013) ("None of the confidential witnesses . . . alleges direct interaction with [CEO] or awareness of [his] knowledge").

[24] The Appeal also abandons an allegation that Dr. Pedder and Mr. Riehle's certifications accompanying quarterly and annual SEC reports pursuant to the Sarbanes-Oxley Act of 2002 supported scienter. JA-19: ¶164; *see Cozzarelli*, 549 F.3d at 628 n.2 (rejecting this argument); *Zucco*, 552 F.3d at 1003-04 (same).

**D.    The Competing Nonculpable Inferences Defeated Scienter**

The District Court acknowledged *Tellabs*' requirement to examine "competing inferences" and ultimately concluded the Complaint did not raise a strong inference of scienter. Order, JA-403-06. As the District Court found, a number of non-culpable inferences negated any inference of scienter.

**Both The Absence Of Stock Sales And The Stock Purchases Negated Scienter**. The District Court found that the "most glaring" of non-culpable inferences undermining scienter was that:

> [N]one of the individual defendants sold stock during the class period. Indeed, one defendant actually bought over $359,000 worth of stock in the open market during the class period. . . . While . . . this fact . . . by itself is not necessarily dispositive of whether scienter is successfully alleged . . . it certainly tips the scales in favor of defendant's motion.

Order, JA-405. Indeed, none of the Individual Defendants sold a single share of stock, notwithstanding a lengthy three and a half year Class Period.[25] This is significant, given their large holdings of Chelsea's stock:

- Dr. Pedder had over 1.88 million shares and vested options. JA-313.

- Mr. Riehle had over 360,000 shares and vested options. *Id*.

- Dr. Hewitt had over 350,000 shares and vested options. *Id*.

---

[25] *See Teachers'*, 477 F.3d at 185 (46 months is "exceedingly long putative class period").

33

- Dr. Schwieterman had over 230,000 shares and vested options. *Id.*

That these individuals did not sell a single share of stock in the three and a half

year Class Period – despite their large holdings – belies the claim that they would

artificially inflate Chelsea's stock. JA-19: ¶¶27, 163, 165, 171(c), 175. There can

be no motive to artificially inflate the company's stock price if one is not seeking

to profit from it through stock sales. Accordingly, courts have held that the failure

to sell stock undermines an inference of scienter.[26] This case is even more benign

than *Cozzarelli*, where defendants there allegedly sold stock during the class period

but those sales were found not suspicious.

Not only did the Individual Defendants sell no shares, but as the District

Court found noteworthy, Dr. Schwieterman – Chelsea's Chief Medical Officer –

---

[26] *See In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 390 (4th Cir. 2005)
(where defendants sold *de minimis* percent of stock ranging from 1% to 13%, sold
no stock options, and lost over $471 million dollars in stock value over the class
period, the only inference was a "'strong inference' . . . that no scienter exist[ed]"
(citation omitted)); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049,
1067 (9th Cir. 2008) (COO "sold nothing at all, suggesting that there was no
insider information from which to benefit"); *Lipton v. Pathogenesis Corp.*, 284
F.3d 1027, 1037 (9th Cir. 2002) (no scienter where CEO "'held onto most of [his]
[company's] stock and incurred the same large losses' as plaintiffs" (second
alteration in original) (citation omitted)); *In re First Union Corp. Sec. Litig.*, 128 F.
Supp. 2d 871, 898 (W.D.N.C. 2001) (disposal of less than 5% of holdings
"affirmatively demonstrates the absence of scienter"); *In re E.Spire Commc'ns,
Inc., Sec. Litig.*, 127 F. Supp. 2d 734, 743 (D. Md. 2001) ("fact that an individual
defendant sold so little stock can be construed as negating the inference that there
was fraud").

*purchased* 85,141 shares of Chelsea stock on the open market during the Class Period for over $359,000.  JA-317, 320; Order, JA-405.  This purchase "negates any idea that [defendant] had a motive to commit fraud."  *In re PEC Solutions, Inc. Sec. Litig.*, No. 03-CV-331, 2004 WL 1854202, at *16 (E.D. Va. May 25, 2004), *aff'd*, 418 F.3d 379 (4th Cir. 2005).

To this day Plaintiff has failed to explain why Dr. Schwieterman, who spent over a decade at the FDA, would spend over $350,000 to purchase more stock if he believed the NDA was doomed to fail.  *See Cozzarelli*, 549 F.3d at 627-28 (that "the total holdings of each defendant increased" during the study "hardly suggest[ed] that defendants sought to dump their shares at an inflated price").[27]

**Chelsea's Investment In Northera Was Inconsistent With Scienter**.  The Individual Defendants' retention of their stock mirrored the Company's investment in Northera: the Defendants' conduct consistently reflected their belief that the NDA would be approved.  Chelsea spent $103.8 million in research and development expenses on Northera from inception through December 31, 2011, in

---

[27] *See Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (defendants' purchase of additional shares of company stock signaled "confidence in the future of their company and, by extension, in [the company's] commercial success"); *Cho v. UCBH Holdings, Inc.*, No. C 09-4208 JSW, 2011 WL 3809903, at *17 (N.D. Cal. May 17, 2011) ("defendant's stock purchases . . . weigh[] against an inference of scienter").

contrast to $42 million spent on development of other products.  JA-276.  Chelsea also spent millions to prepare for Northera's commercial launch, hiring and training dozens of sales people – who would have nothing to sell if Northera were not approved.  *See* JA-19: ¶54.  Plaintiff's theory that Defendants knew that this massive investment was doomed from the start does not make sense.[28]

*Cozzarelli* is again instructive.  There, as here, one study met its endpoint.  That success made it more likely the defendants believed the second study would succeed rather than fail.  The Fourth Circuit found support for that proposition where the drug at issue was "the 'lead development product' on which Inspire's future . . . depended."  549 F.3d at 628.  The Court of Appeals stated:

> It is improbable that Inspire would stake its existence on a drug and a clinical trial that the company thought was doomed to failure.

*Id.*[29]  The Appeal ignores *Cozzarelli* yet again on the same issue.  The Appeal instead contends that "[d]roxidopa's importance to Chelsea's financial condition"

---

[28] *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[d]etermining whether a complaint states a plausible claim . . . requires the reviewing court to draw on its judicial experience and common sense").

[29] *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117-18 (9th Cir. 1989) ("Apple's massive investment" in a new product demonstrates its "good faith belief" that it will succeed); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1420 (9th Cir. 1994) (company commenced production schedule four days prior to debenture offering, which would have been illogical had sales "dried up"); *see Sarafin*, 2013 WL 139521, at *18 (using funds from stock offering to finance the
(continued...)

supports scienter." AOB44-46 & n.11 ("drug was the 'leading product'" (citation omitted)). Plaintiff bootstraps one implausible argument – that Defendants would bet the future on a lead product which was doomed to failure – with the argument that *Cozzarelli* rejected – that "Defendants were incentivized to intentionally . . . mislead investors" "precisely because the Company had limited (and dwindling) resources." AOB51. This does not pass the smell test.[30]

The Appeal also argues that Defendants' senior positions at Chelsea provided them access to material non-public information that contradicted their public statements. AOB44-45; JA-19: ¶164. The District Court correctly found these allegations boilerplate (Order, JA-405-06), as other courts have done.[31]

---

(...continued from previous page)
development of the device does not support scienter and instead "'indicat[es] Defendants' belief that [the device's] potential as a successful and lucrative product for the company justified the expenditures'" (second alteration in original) (citation omitted)).

[30] *See Sarafin*, 2013 WL 139521, at *17 (that company "would recklessly forego necessary tests and studies . . . makes little sense" where Augment is BTMI's flagship product and necessary to [its] success").

[31] *See PEC*, 2004 WL 1854202, at *14 ("mere fact that a defendant occupied a senior position . . . is not sufficient to impart knowledge of the specific fact of materiality"); *In re Criimi Mae, Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 661 (D. Md. 2000) (rejecting reliance on fact of senior positions and access to unspecified information; otherwise, "every corporate executive who participates in the day-to-day management of his company would be exposed to liability for securities
(continued...)

**Chelsea's Blunt Warnings Undermined Scienter**.  Also illogical is

Plaintiff's contention that Defendants tried to deceive and mislead investors.

Investors clearly understood the stakes.  Chelsea repeatedly stressed that the failure

to obtain FDA approval would "severely undermine" its business, leaving it

"without any source of revenue" and risking Chelsea's ability to ever "develop or

acquire another product candidate."  JA-307.  The Complaint admitted that Chelsea

"made no secret of the fact" that FDA approval of Northera "was critically

important to the Company's future."  JA-19: ¶57; *see id.* ¶¶3, 7, 18, 53, 56.

Chelsea also repeatedly warned investors about its development efforts for

Northera throughout the Class Period.  On September 24, 2009, Chelsea reported

that Study 302 did not meet statistical significance on its primary endpoint; it

warned that there were "potential questions regarding the suitability of this type of

trial design for an NOH study."  JA-150; JA-19: ¶78.  Ten days later, Dr. Pedder

described Chelsea's challenges – that the Company was "'*pioneering some of the*

*work done in this area . . . using scales which have not been used previously to*

*support any filing for the improvement of symptoms* – or functional improvement'"

_____

(...continued from previous page)
fraud"); *In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 475 (M.D.N.C. 2004)
(similar).

in patients with NOH.  JA-19: ¶73.[32]  Chelsea disclosed its intention to reach out

"with some urgency" to the FDA to discuss Study 302's results and "determine the

best way forward" for Study 301, including a possible change in Study 301's

primary endpoint.  JA-156; JA-19: ¶79.

After Chelsea announced that it would accelerate the filing of its NDA, it

cautioned investors on March 2, 2011 that "*[a]lthough the FDA has agreed to

review our NDA based on Studies 301 and 302, there is no guarantee that we will

obtain approval on this basis*."  JA-239.  Following the September 2011

submission of the NDA, Chelsea made clear that even though the FDA had granted

an SPA for Study 301, the "SPA determination" did not guarantee actual approval

that "Study 301 data will be adequate to support the approval of our NDA," and

that the "FDA has significant latitude and discretion in interpreting the terms of an

SPA."  JA-141.  Chelsea cautioned that the FDA might reject the OHQ as the

"appropriate primary endpoint of Study 301" or find "that the safety database

information contained in the NDA is inadequate to effectively establish the clinical

---

[32] *See* JA-163 ("As no other compound has successfully demonstrated
symptomatic benefit to the FDA's satisfaction, there [were] some inherent
challenges in selecting an endpoint to meet this objective. . . .  [T]here is no single
widely accepted scale used to measure symptomatic benefit in NOH. . . .  [W]e
opted to utilize . . . a relatively new orthostatic hypotension questionnaire . . . .").

safety of Northera" and "*may not accept or approve our recently filed New Drug Application, or NDA, for Northera*." *Id*. Chelsea specifically warned:

> [T]he FDA . . . may find that the clinical data submitted in the NDA is not sufficient to establish the clinical efficacy of Northera . . . .
>
>  . . . .
>
> [T]here can be no assurance that the FDA . . . will not require additional clinical efficacy to support approval of our NDA.

*Id.*

Even when reporting the positive development on February 23, 2012 that the FDA's Advisory Committee recommended approval, Chelsea continued to warn that "the FDA is not bound by the recommendations of its advisory committees." JA-258. Chelsea warned that it "may not receive FDA approval of our NDA or such approval might be delayed." JA-273.

The District Court correctly found that Plaintiff did not raise the required strong inference of scienter given Chelsea's warnings:

> [Defendants'] optimism does not rise to the level of recklessness articulated in *Phillips* . . . in light of the numerous warnings that Chelsea gave investors regarding the sufficiency of Northera's NDA. Chelsea warned investors that the FDA might reject the NDA on the grounds that the OHQ [was] "the appropriate primary endpoint of Study 301"; that the safety database information in the NDA is inadequate to establish clinical safety of Northera"; or that the clinical data regarding the clinical efficacy was "insufficient."

40

Order, JA-405.  The Court further held that it had "weighed the competing

inferences" and found the Complaint failed to meet its burden where among other

things "Chelsea gave investors several clear and explicit warnings regarding the

prospects for the Northera NDA."  Order, JA-406; *see Matrix Capital Mgmt. Fund,*

*LP v. BearingPoint, Inc.*, 576 F.3d 172, 189 (4th Cir. 2009) ("[T]he disclosure

made about internal control deficiencies lends some weight to the inference that

defendants were not acting with scienter but rather were endeavoring in good faith

to inform investors of their internal control and financial reporting problems.").[33]

     The Appeal asserts that the District Court erred by "examining categories of

allegations in isolation" and failing to consider the allegations "holistically."

AOB2, 34, 49-50.  This is baseless.[34]  The District Court correctly considered

_____

[33] *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters
Corp.*, 632 F.3d 751, 759-60 (1st Cir. 2011) ("inference of scienter is especially
unwarranted" where defendant disclosed that investment in Japan had "'beg[un] to
tail itself off'"; "'[A]ttempts to provide investors with warnings of risks generally
weaken the inference of scienter'" (second alteration in original) (quoting *Ezra
Charitable Trust v. Tyco Int'l, Ltd.*, 466 F.3d 1, 8 (1st Cir. 2006))); *Ziemba v.
Cascade Int'l, Inc.*, 256 F.3d 1194, 1211 (11th Cir. 2001) ("we believe that the
disclosures actually made . . . significantly undermine any hint of fraud"); *Sarafin*,
2013 WL 139521, at *14 (company "repeatedly and consistently warned that there
were no guarantees that Augment would be approved and that there were risks and
uncertainties in the prospect").

[34] *See Malin v. XL Capital, Ltd.*, 312 F. App'x 400, 402 (2d Cir. 2009) ("having
concluded that none of plaintiffs' allegations [serially] showed even a weak
inference of scienter, there is no logical way that the District Court could then have
(continued...)

41

Plaintiff's allegations and weighed them "against the opposing inferences that may be drawn from the facts in their entirety" and concluded the "Complaint falls . . . short of that [required] mandate."  Order, JA-403, 406.  Here, the more plausible and non-culpable explanation was that Defendants steadfastly believed in Northera's prospects.  That belief was not unreasonable,[35] much less fraudulent.[36]

## E.    The District Court Did Not Err By Considering SEC Filings.

The Appeal devotes over fifteen pages to argue that the District Court erred in taking "judicial notice of the fact that 'none of the individual defendants sold stock during the class period' and 'one defendant actually bought over $359,000 worth of stock in the open market during the class period.'"  AOB25-26; *see* AOB13-14, 17-29.  The District Court found that scienter was not established due to a number of pleading failures.  That Defendants did not sell stock and that Dr.

_____

(...continued from previous page)
determined that the combined effect of the allegations would form a *strong* inference of scienter").

[35] *Cf. Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193, 207 (2005) (it "'will not always be clear to parties setting out to seek FDA approval for their new product exactly which kinds of information, and in what quantities, it will take to win that agency's approval'" (citations omitted)).

[36] *See AstraZeneca*, 559 F. Supp. 2d at 470 ("if the management . . . releases positive reports about the drug . . . which the management honestly believes to be true . . . then that is not securities fraud, even though . . .  some event occurs which prevents the marketing of the drug").

Schwieterman made purchases is not essential to that holding.  In any event,

Plaintiff's argument fails for numerous reasons.

First, it is nothing short of ironic that Plaintiff maintains that "all of the facts

alleged" must be considered (AOB34, 49, 51), yet labors mightily to prevent this

Court from considering all the allegations, including the failure to allege a single

stock sale.  *See Cozzarelli*, 549 F.3d at 625-26 (rejecting "urg[ing]" by plaintiff not

to "look beyond the complaint for additional facts" where the reports plaintiff

sought to conceal "demonstrate the fundamental weakness of plaintiffs' case").

*Tellabs* instructs that in considering the complaint in its entirety pursuant to a Rule

12(b)(6) motion, courts "must consider . . . documents incorporated into the

complaint by reference, and matters of which a court may take judicial notice."

551 U.S. at 322; Order, JA-401.[37]

Second, Plaintiff is fundamentally confused in suggesting that review of

Chelsea's SEC filings was necessary to establish the absence of any Individual

Defendant's stock sales.  AOB 17, 25-26.  Plaintiff ignores that the *Complaint*

*itself made no allegation that any Defendant sold stock*.  Courts may consider what

---

[37] *See Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537
F.3d 527, 543 (5th Cir. 2008) ("Pursuant to *Tellabs* . . . both culpable and
nonculpable explanations for stock sales, as revealed in the pleadings and
associated documents, must be considered.").

a complaint alleges, as well as what it does not, including the absence of stock sales.[38]

Third, with respect to Dr. Schwieterman's stock purchases and the Individual Defendants' respective holdings, Plaintiff has never disputed the authenticity of the SEC filings or the accuracy of the facts contained therein. Indeed, the Complaint expressly stated that Plaintiff's allegations were based on SEC filings. JA-22. Accordingly, Plaintiff's assertion that the incorporation by reference doctrine was inapplicable (AOB26) is erroneous. The SEC filings were fully reviewable under both the incorporation by reference doctrine and judicial notice.[39]

---

[38] *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1253 (11th Cir. 2008) ("the amended complaint says nothing about suspicious stock transactions by any of the individual defendants, an omission that weighs against inferring scienter"); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.3 (11th Cir. 1999) (similar); *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008) ("the complaint does not allege that . . . defendants . . . sold those shares"); *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1085 (8th Cir. 2005) ("none of the other Individual Defendants are alleged to have traded any stock during the class period"); *Acito v. Imcera Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("the complaint failed to allege that any other defendant sold any shares of IMCERA stock during this period"); *see also Metzler*, 540 F.3d at 1067 (COO "sold nothing at all").

[39] *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (considering Forms 3 and 4 where plaintiff alleged that her allegations were based in part on review of SEC filings).

Indeed, the Appeal *ignores* that *this Court has squarely examined – in the dismissal context –* Form 4s and proxy statements to *substantively consider* the specific number of shares that defendants sold, and the percentage of shares sold relative to available holdings, to assess whether alleged insider trading is suspicious. The Fourth Circuit took judicial notice of SEC filings in *PEC* to evaluate the defendants' actual and relative sales in comparison to their stock holdings, stating that "Karlgaard, Rice, Harbitter and Lloyd sold, respectively, 1.17%, 1.47%, 1.79%, and 13.0% of their holdings of PEC stock during the class period." 418 F.3d at 390. In doing so, the Court stated:

> The percentages are derived from the [Complaint] and *documents publicly filed* by each Appellee *with the SEC, of which this court can take judicial notice*.

*Id*. at 390 n.10 (emphasis added). The *PEC* Court further noted options exercised *but not sold* to consider the amount of *money defendants lost by holding stock* rather than selling. *Cozzarelli* is similar. The Fourth Circuit observed that the CEO "sold 2,000 shares in July 2004 . . . about 3% of her total holdings." 549 F.3d at 622.[40] The Appeal ignores these decisions and thus errs in stating that the

---

[40] *See Inspire*, 515 F. Supp. 2d at 640 (relying on defendants' stock sale exhibits to calculate percent of holdings sold); Declaration of C. Paul Chalmers in Support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint ¶¶28-31 (attaching proxy statement and Forms 4 and 5), *In re Inspire Pharm., Inc. Sec. Litig.*, No. 1:06CV00201 (M.D.N.C. June 30, 2006), ECF No. 23.

District Court's decision "is in conflict with Fourth Circuit authority as well as that of other circuit courts."  AOB26-27.

*PEC and Cozzarelli* refute Plaintiff's contention that courts do not consider the "substantive truth" of SEC filings concerning defendants' stock holdings. AOB20-25.  Both Courts considered the facts of the stock transactions, not just that a disclosure was made in an SEC filing.  *PEC and Cozzarelli* make manifest that it is appropriate to consider stock sale evidence for the precise purpose the District Court did here – to ascertain whether Plaintiff raised a strong inference of scienter. *PEC* and *Cozzarelli* are hardly unique.

Courts in virtually every circuit routinely examine the contents and specifics of stock transactions in securities fraud actions.  *See Metzler*, 540 F.3d at 1064 n.7, 1067 (reviewing specifics of stock transactions based on SEC filings which were properly judicially noticed and concluding they "tell[] a different story" than as alleged in the complaint); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 699 F. Supp. 2d, 331, 339-40 n.31, 345-46 (D. Mass. 2010) ("After reviewing SEC filings . . . attached to Defendants' Motion . . . it is clear . . . that Inter-Local dramatically inflated the percentage of Mr. Ornell's total holdings unloaded"), *aff'd*, 632 F.3d 751, 761 (1st Cir. 2011) (recalculating

46

plaintiff's percentage sold to account for exercisable options).[41]

As a final matter, consideration of SEC filings does not convert the dismissal motion into one for summary judgment. *Compare* AOB14, 17-18, 29, *with PEC*, 418 F.3d at 388-89, 390 nn.7, 10; *Cozzarelli*, 549 F.3d at 622; *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 n.4 (4th Cir. 2004) (taking judicial notice of stock price movements does not convert dismissal motion to summary judgment). In sum, the District Court did not err in considering the SEC filings.

## III.  AFFIRMANCE IS WARRANTED ON THE ALTERNATIVE GROUND THAT THE COMPLAINT FAILED TO PLEAD A FALSE OR MISLEADING STATEMENT

The Complaint alleged that Defendants made a number of false and

---

[41] *See also Ind. Elec.*, 537 F.3d at 543-44 (discussing context and specifics of stock sales based on Forms 4 and Form 10-Q; "Shaw's SEC filings, referenced in the complaint, reveal that Belk had actually sold . . . stock twice before"); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 133, 150-57 (D. Conn. 2007) ("SEC Forms 3, 4, and 5 . . . are routinely . . . considered for the truth of their contents"; noting defendants increased their holdings during class period), *aff'd*, 312 F. App'x 400 (2d Cir. 2009); *In re K-Tel Int'l, Inc., Sec. Litig.*, 107 F. Supp. 2d 994, 997-98, 1005 (D. Minn. 2000) (discussing number of shares both bought and sold based on Forms 4), *aff'd*, 300 F.3d 881, 895-96 (8th Cir. 2002); *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (Court granted request for judicial notice on appeal to review Forms 4 and 5, and reviewed shares sold, percent of holdings sold, and proceeds); *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 969 (S.D. Ohio 2009) (reviewing defendants' submission of Form 4s and noting that no shares were sold and instead some defendants acquired stock during class period); *In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1173 (S.D. Fla. 2004) (reviewing defendants' submission of Form 4s; noting defendants forfeited stock for tax withholding purposes and one bought shares).

47

misleading statements.  The District Court questioned whether Plaintiff had

adequately pleaded falsity (Order, JA-402) but ultimately predicated the dismissal

on Plaintiff's failure to raise a strong inference of scienter (Order, JA-402-06).

The Appeal contends the District Court erred because it did not adjudicate whether

Chelsea misled investors regarding the contents of the FDA's Briefing Document.

AOB1, 29, 33.

      The District Court did not need to reach falsity where Plaintiff failed to raise

a strong inference of scienter.[42]  Nonetheless, this Court may affirm dismissal on

the failure to plead falsity with the required specificity.  *See Greenhouse*, 392 F.3d

at 660 (Court "'may affirm the dismissal by the district court on the basis of any

ground supported by the record even if it is not the basis relied upon by the district

court.'" (citation omitted)).[43]  As shown below, the failure to plead a false and

misleading statement provides an alternative ground to affirm the dismissal.

---

[42] *See Cozzarelli*, 549 F.3d at 625 (assuming on appeal that statements were
false and misleading but affirming based on failure to plead scienter); *PEC*, 418
F.3d at 388 n.6 (the Court may affirm on the sole basis of plaintiff's "failure to
meet the PSLRA's heightened scienter-pleading requirement" without addressing
the underlying falsity of statements).

[43] *See Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 337 n.2
(4th Cir. 2012) (same); *Suter v. United States*, 441 F.3d 306, 309 (4th Cir. 2006).

**No False Or Misleading Statement About The Briefing Document**.  The Appeal concedes that the February 13, 2012 press release's discussion of the Briefing Document was "perhaps literally true."  AOB31.  The Appeal contends, however, that it "undoubtedly misled investors about the *most critical fact*, namely the FDA Briefing Document's recommendation that Chelsea's NDA be denied."  AOB15, 31; *see* AOB32.  This argument fails.

Preliminarily, the Appeal erroneously characterizes the press release as "merely stating" that Chelsea reported that it was in "'receipt of [the] briefing document'" and that "'several lines of inquiry . . . have emerged as significant components of the benefit-risk analysis.'"  AOB11; JA-19: ¶¶8, 100.  In fact, Chelsea reported a number of the report's concerns, including the "'short duration of [Chelsea's] clinical studies, the limited size of [Chelsea's] study population given the orphan indication and the challenges in quantifying symptomatic and clinical benefit.'"  JA-248.  Chelsea specifically stated that the FDA Briefing Document "'placed increased emphasis on safety data from [Chelsea's] long-term extension program and the post-marketing surveillance program in Japan.'"  JA-248-50.  The announcement described Northera's safety data, including the death of 19 patients, and reports from Japan of a "potentially life-threatening neurological disorder."  JA-250.  It noted that Dr. Pedder would be addressing those and other "key issues identified in the FDA briefing document" later that

49

day.  JA-248.  Chelsea further advised that it would "'address these questions in depth during the advisory committee meeting'" and would continue "'to work with [the] FDA to address any additional questions they may have regarding Northera and our clinical program.'"  *Id*.  The press release specifically warned that "Chelsea's Northera development program may not adequately establish a durable treatment effect as a result of the short duration of double-blind, placebo controlled clinical trials."  JA-249.  The press release hardly led investors to believe the Briefing Document posed no risk to Chelsea's efforts.[44]

Having mischaracterized the contents of the press release and speculating that the failure to disclose the recommendation against approval was material,[45] the

---

[44] *See Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) ("With this [report that earnings reflect substantial expenses from Polavision] emphasized three times, we ask did this report mislead investors to buy stock because Polavision was doing so well?").

[45] The Appeal contends that the Briefing Report's recommendation against approval was material because Chelsea's stock dropped after the FDA published the Briefing Document on February 21, 2012.  AOB32.  The Fourth Circuit has cautioned that courts "must be chary of theories that purport to discern precisely what caused stock prices to rise or fall" and that stock price movements are not "dispositive evidence" of materiality.  *Greenhouse*, 392 F.3d at 660-61 (emphasis omitted); *see also Sarafin*, 2013 WL 139521, at *18 (dismissing notwithstanding failure to disclose receipt of FDA deficiency letter; it "'simply cannot be that every critical comment by a regulatory agency . . . has to be seen as material for securities law reporting purposes'" (alteration in original) (citations omitted)); *Cozzarelli*, 549 F.3d at 622, 626 (company did not disclose the primary endpoint of the study).

Appeal asserts that Chelsea had "a statutory duty to disclose the bottom line recommendation of the FDA briefing document under Rule 10b-5." AOB30. The Appeal cites to the Supreme Court's decision in *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1322 (2011) and to decisions outside the Fourth Circuit and prior to *Matrixx*. AOB29-31. Yet the Appeal conspicuously omits *Matrixx's* instruction that even with respect to material information,

> it bears emphasis that § 10(b) and Rule 10b-5(b) *do not create an affirmative duty to disclose any and all material information*. Disclosure is required . . . only when necessary "to make . . . statements made, in the light of circumstances under which they were made, not misleading."

*Matrixx*, 131 S. Ct. at 1321-22 (alteration in original) (emphasis added) (citing, inter alia, 17 C.F.R. § 240.10b-5(b)).[46] Plaintiff did not adequately plead the press release was false and misleading.[47]

---

[46] *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (Rule 10b-5 "prohibit[s] *only* misleading and untrue statements, not statements that are incomplete;" it does not "contain[] a freestanding completeness requirement").

[47] *See Sarafin*, 2013 WL 139521, at *18 (noting FDA deficiency letter, which was not disclosed, is "not a final FDA decision"); *PEC*, 2004 WL 1854202, at *9, *10 (statement that company "was experiencing 'temporary discontinuity' in one of its biometric contracts" did not "trigger a duty to disclose 'every tangentially related fact that might interest investors' about the biometrics contract" (citations omitted)); *Brody*, 280 F.3d at 1006 (press release that provided information about the company's stock repurchase program but did not include information about the possible takeover of the company was not misleading where there was no affirmative implication that a merger was imminent).

The Appeal contends that the failure to disclose the report's recommendation against approval "necessarily[] satisfies the scienter pleading standard." AOB32. But if that were true, Chelsea's press release would not have directed investors to the link where the Briefing Document itself would be publicly available in eight days.[48] The disclosure of adverse information in the press release together with the facilitation of investors' access to the Briefing Document itself defeats any hint of deception.

**The Appeal Abandons Allegedly False Statements About The Validation Of The OHQ.** The Complaint alleged that statements referencing the OHSA or OHQ as "'a validated scale'" (JA-19: ¶¶116-119, 127-128) were false and misleading because the "OHQ had never been used to evaluate any other pharmaceutical product and had never been found to be a useful predictor of efficacy" (JA-19: ¶121). *The Appeal abandons this contention.* The "support" for Plaintiff's contention was a research article that was not published until November 2011, "*15 months after* Study 301 was completed." JA-19: ¶67. The date of the article hardly established the invalidity of the OHQ for Chelsea's studies. In fact, the article concluded that the OHQ *was a valid tool for assessing clinical outcomes*

---

[48] *Metzler*, 540 F.3d at 1069 (rejecting adverse inference where CFO's statement was an "utterance [made] at a company-wide meeting").

in patients with NOH and cited to a 1998 trial as evidence of the validation of OHQ.[49]

The significance of the FDA's grant of an SPA initially and after Study 301 was altered *to make the OHQ composite the primary endpoint* cannot be overstated.  JA-186; JA-19: ¶¶76, 80.  The SPA is a "binding agreement that the *study design*, including . . . *clinical endpoints* and/or *data analyses* are acceptable to support regulatory approval."  JA-19: ¶76 (emphasis added).  Thus, *the FDA accepted the OHQ*.  *See* JA-366 ("[T]his protocol was approved with this instrument as the primary endpoint."); JA-367 ("We heard that perhaps the OHQ wasn't really a validated instrument . . . .  But I'm sure that was part of the SPA.").

Plaintiff ignored that Chelsea expressly warned that it was "'*using scales which have not been used previously to support any filing for the improvement of symptoms* – or functional improvement'" in patients with NOH and had "opted to utilize . . . a relatively new orthostatic hypotension questionnaire."  JA-19: ¶73; JA-163.  Thus, investors "knew of the very type of discrete problems that Plaintiffs

_____

[49] Horatio Kaufmann, *et al.*, The Orthostatic Hypotension Questionnaire (OHQ): Validation of a Novel Symptom Assessment Scale, Clin. Auton. Res 22:79-90 (2012); JA-281, 291.  Dr. Kaufmann was part of a research team that validated the OHQ between January 2002 and September 2004.  JA-294.

maintain [the company] should have disclosed." *First Union*, 128 F. Supp. 2d at 891.

**Defendants Made No False Or Misleading Statements About The Studies**.  The Appeal complains that statements misrepresented the overall strength of the NDA because Studies 302 and 303 "failed to achieve their primary endpoints" and failed to provide "'confirmatory evidence of benefit.'"  AOB14, 39-40, 43; JA-19: ¶¶103, 122-125, 130-132.  Chelsea did not state otherwise.[50] Chelsea provided detailed information about its trial methodologies and results (JA-19: ¶¶47-52, 78-79), and none of this historical data was alleged to be false. The Appeal also complains that the FDA found Study 301 failed to demonstrate necessary durability of effect.  AOB39.  Again, the Complaint cited no false facts about Study 301's results or methodologies.  That Chelsea reported some beneficial aspects of Study 302 and that Plaintiff is dissatisfied with Study 301's durational effect do not make any statements false.[51]

---

[50] JA-19: ¶78 (announcing that "the top-line results from Study 302 . . . *failed to demonstrate* a statistically significant improvement); JA-19: ¶124 ("'the study did not meet its primary endpoint'").

[51] *See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 878-79 (9th Cir. 2012) ("merely alleging that defendants should have used different statistical methodology in their drug trials is not sufficient to allege falsity"; that "plaintiffs disagreed with the researchers about the import of the data did not make the defendants' summaries . . . false or misleading"); *Padnes v. Scios Nova Inc.*, No. C
(continued...)

## IV.    THE CONTROL PERSON CLAIM NECESSARILY FAILED

Because Plaintiff failed to meet the Reform Act's pleading requirements for a false and misleading statement and scienter, the claim for control person liability under Section 20(a) of the Securities Exchange Act necessarily failed as well.  *See Teachers'*, 477 F.3d at 188; *Cozzarelli*, 549 F.3d at 628; *Matrix*, 576 F.3d at 192. Plaintiff cannot contend otherwise.  AOB52.

## V.    THE APPEAL DOES NOT CHALLENGE DISMISSAL WITH PREJUDICE

The Appeal does not challenge the District Court's dismissal with prejudice. The Appeal should be affirmed on the alternative, independent ground that any further amendment would be futile.  Denial of leave to amend is reviewed for abuse of discretion.  *PEC*, 418 F.3d at 387.

Below, Plaintiff never made a motion for leave to amend.  Instead, Plaintiff noted *in a footnote in his Opposition Brief* that "in the event the Court determines the Complaint is deficient in any respect, Plaintiff respectfully requests an opportunity to seek leave to replead."  JA-357 n.18.  At the hearing on the Motion

---

(...continued from previous page)
95-1693 MHP, 1996 WL 539711, at *5 (N.D. Cal. Sept. 18, 1996) (disagreements over study design and interpretation insufficient to allege falsity: "where a company accurately reports the results of a scientific study, it is under no obligation to second-guess the methodology of that study").

to Dismiss, Plaintiff's counsel did not suggest any amendments he could offer if the Complaint were dismissed, despite the District Court's invitation to provide further argument.  JA-396.  Counsel argued that the absence of stock sales by any Defendant did not defeat scienter.  JA-390-91.

The District Court denied the request for leave to amend that was made only in a footnote, observing that the Fourth Circuit rejected the "only mention of leave to amend [when it] comes in a footnote at the very end of Plaintiff's brief."  Order, JA-407 (citing *Cozzarelli*, 549 F.3d at 630-31 (denying leave where plaintiff requested leave "in a footnote" and never in a formal motion)).  Plaintiff's footnote provided "no indication how a second Amended Complaint might cure any of the above deficiencies, and a proposed Second Amended Complaint was not proffered."  Order, JA-407.  The District Court further concluded that amendment would be futile in that it:

> would not change the fact that 1) none of the individual defendants sold stock . . . ; 2) Chelsea gave investors numerous warnings regarding the sufficiency of the Northera NDA; and 3) that the Fourth Circuit Court of Appeals has already flatly rejected plaintiff's principal theory of scienter.

Order, JA-406.

The District Court did not abuse its discretion, and the Appeal does not argue otherwise.  Plaintiff never made a motion for leave to amend.  *See Cozzarelli*, 549 F.3d at 630-31 (the district court did not abuse "its discretion by

declining to grant a motion that was never properly made"). Plaintiff never showed how amendment could cure his defective motive theory, even apart from all the other facts negating scienter. *See Cozzarelli*, 549 F.3d at 630 (court did not abuse its discretion where amendment would be futile "in light of the fundamental deficiencies in plaintiffs' theory of liability"); *PEC*, 418 F.3d at 390-91 (no abuse of discretion where the proposed amendments did not cure the failure to plead a strong inference of scienter). In sum, the Complaint was properly dismissed with prejudice.

## CONCLUSION

For the reasons stated herein, the Judgment should be affirmed.

## REQUEST FOR ORAL ARGUMENT

Defendants respectfully request oral argument on the basis that it would assist the Court. This appeal raises important issues under the Reform Act, which established unique and stringent pleading standards.

Dated: February 18, 2014     WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


By: /s/ Barry M. Kaplan
Barry M. Kaplan

**CERTIFICATION OF COMPLIANCE TO FED. R. APP. P 32(a)(7)(C)**

I certify that: This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief contains 13,346 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 2010 in 14 point font size and Times New Roman type style.

Dated: February 18, 2014          /s/ Barry M. Kaplan
                                  Barry M. Kaplan

58

# STATUTORY ADDENDUM



United States Code Annotated Currentness
  Title 15. Commerce and Trade
    Chapter 2B. Securities Exchanges (Refs & Annos)
      ➡➡ **§ 78j. Manipulative and deceptive devices**

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--

**(b)** To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement [FN1] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

c

United States Code Annotated Currentness
  Title 15. Commerce and Trade
    Chapter 2B. Securities Exchanges (Refs & Annos)
      ➡➡ **§ 78t. Liability of controlling persons and persons who aid and abet violations**

(a) Joint and several liability; good faith defense

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

▷

United States Code Annotated Currentness
  Title 15. Commerce and Trade
    🗏 Chapter 2B. Securities Exchanges (Refs & Annos)
    ➡➡ **§ 78u-4. Private securities litigation**

(b) Requirements for securities fraud actions

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant--

**(A)** made an untrue statement of a material fact; or

**(B)** omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

(A) In general

Except as provided in subparagraph (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(B) Exception

In the case of an action for money damages brought against a credit rating agency or a controlling person under this chapter, it shall be sufficient, for purposes of pleading any required state of mind in relation to such action, that the complaint state with particularity facts giving rise to a strong inference that the credit rating agency knowingly or recklessly failed--

**(i)** to conduct a reasonable investigation of the rated security with respect to the factual elements relied upon by its own methodology for evaluating credit risk; or

**(ii)** to obtain reasonable verification of such factual elements (which verification may be based on a sampling technique that does not amount to an audit) from other sources that the credit rating agency considered to be competent and that were independent of the issuer and underwriter.

 (3) Motion to dismiss; stay of discovery

 (A) Dismissal for failure to meet pleading requirements

In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

▷

United States Code Annotated Currentness
  Title 21. Food and Drugs (Refs & Annos)
    Chapter 9. Federal Food, Drug, and Cosmetic Act (Refs & Annos)
      Subchapter V. Drugs and Devices
        Part A. Drugs and Devices (Refs & Annos)
          ➡➡ **§ 355. New drugs**

 (d) Grounds for refusing application; approval of application; "substantial evidence" defined

If the Secretary finds, after due notice to the applicant in accordance with subsection (c) of this section and giving him an opportunity for a hearing, in accordance with said subsection, that (1) the investigations, reports of which are required to be submitted to the Secretary pursuant to subsection (b) of this section, do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof; (2) the results of such tests show that such drug is unsafe for use under such conditions or do not show that such drug is safe for use under such conditions; (3) the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to preserve its identity, strength, quality, and purity; (4) upon the basis of the information submitted to him as part of the application, or upon the basis of any other information before him with respect to such drug, he has insufficient information to determine whether such drug is safe for use under such conditions; or (5) evaluated on the basis of the information submitted to him as part of the application and any other information before him with respect to such drug, there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof; or (6) the application failed to contain the patent information prescribed by subsection (b) of this section; or (7) based on a fair evaluation of all material facts, such labeling is false or misleading in any particular; he shall issue an order refusing to approve the application. If, after such notice and opportunity for hearing, the Secretary finds that clauses (1) through (6) do not apply, he shall issue an order approving the application. As used in this subsection and subsection (e) of this section, the term "substantial evidence" means evidence consisting of adequate and well-controlled investigations, including clinical investiga-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

tions, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof. If the Secretary determines, based on relevant science, that data from one adequate and well-controlled clinical investigation and confirmatory evidence (obtained prior to or after such investigation) are sufficient to establish effectiveness, the Secretary may consider such data and evidence to constitute substantial evidence for purposes of the preceding sentence. The Secretary shall implement a structured risk-benefit assessment framework in the new drug approval process to facilitate the balanced consideration of benefits and risks, a consistent and systematic approach to the discussion and regulatory decisionmaking, and the communication of the benefits and risks of new drugs. Nothing in the preceding sentence shall alter the criteria for evaluating an application for pre-market approval of a drug.

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

17 C.F.R. § 240.10b–5    Page 1

C

Code of Federal Regulations Currentness
  Title 17. Commodity and Securities Exchanges
    Chapter II. Securities and Exchange Commission
      Part 240. General Rules and Regulations, Securities Exchange Act of 1934
      (Refs & Annos)
        Subpart A. Rules and Regulations Under the Securities Exchange Act of 1934
          Manipulative and Deceptive Devices and Contrivances
          ➙ **§ 240.10b–5 Employment of manipulative and deceptive devices.**

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Westlaw. © 2013 Thomson Reuters.
END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# CERTIFICATE OF SERVICE

I certify that on February 18, 2014, the foregoing Response Brief of

Appellees was served on all registered participants or their counsel of record

through the CM/ECF system, including registered participant:

Richard W. Gonnello
FARUQI & FARUQI, LLP
369 Lexington Avenue
10th Floor
New York, NY 10016

I further certify that on February 18, 2014, I caused eight paper copies of the

Response Brief of Appellees to be sent via Federal Express for overnight delivery

to the Clerk of this Court at the following address:

Patricia S. Connor, Clerk
U.S. Court of Appeals for the Fourth Circuit
1100 East Main Street, Suite 501
Richmond, VA 23219-3517

Dated:  February 18, 2014          /s/ Cheryl W. Foung
                                    Cheryl W. Foung